**[J-60-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 3 WAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered June 13, |
| | : | 2023, at No. 1008 WDA 2021, |
| v. | : | Affirming the Order of the Court of |
| | : | Common Pleas of Allegheny County |
| | : | entered December 19, 2016, at No. |
| DEREK LEE, | : | CP-02-CR-0016878-2014. |
| | : | |
| Appellant | : | ARGUED: October 8, 2024 |

**OPINION**

**CHIEF JUSTICE TODD**                    **DECIDED: MARCH 26, 2026**

In this appeal by allowance, we granted allocatur to consider whether a mandatory sentence of life imprisonment without the possibility of parole for a felony murder conviction violates the Eighth Amendment to the United States Constitution or Article I, Section 13 of the Pennsylvania Constitution.[1]  For the reasons that follow, we determine that a mandatory life without parole sentence for all felony murder convictions, absent an assessment of culpability, is inconsistent with the protections bestowed upon our citizens

---

[1] The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  Article I, Section 13 of the Pennsylvania Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted."  Pa. Const. art. I, § 13.

under the "cruel punishments" clause of our Commonwealth's organic charter.[2] Thus, we reverse the order of the Superior Court, vacate Appellant's judgment of sentence, and remand for resentencing. However, as we have done under similar circumstances, we stay our order for 120 days to provide a reasonable amount of time for the General Assembly to consider remedial measures.

## I. Facts and Procedural History

Leonard Butler, Tina Chapple, and their 9-year-old son, also named Leonard, shared a residence in the Elliott neighborhood of Pittsburgh, Pennsylvania. On October 14, 2014, at approximately three o'clock in the afternoon, while their son was attending school, two men entered the residence. Chapple was upstairs, but was called to come down from the second-floor bedroom to the living room by Butler. When she entered the living room, she observed two males with guns and partially covered faces. Both Butler and Chapple were herded into the basement of the home, and then were forced to kneel. Both males yelled at Butler to give up his money and, several times, one used a taser on Butler. One of the men, referred to by Chapple in interviews with police as "the meaner one," and later identified as Appellant Derek Lee, pistol-whipped Butler in the face before taking his watch and running up the stairs. The second male, later identified as Paul Durham, remained with the couple. Butler began to struggle with Durham over the gun, and a shot was fired which killed Butler.

Later, during the police investigation of the murder, it was determined that a rental vehicle under Appellant's name was parked outside of Butler and Chapple's home around the time of the shooting. On October 29, 2014, Chapple was shown a photo array by

---

[2] Generally speaking, "the legislative intent to forever bar parole eligibility for all individuals convicted of second-degree murder is best described as part of the judgment of sentence." *Scott v. Pennsylvania Board of Probation and Parole*, 284 A.3d 178, 192 (Pa. 2022).

police and positively identified Appellant as one of the men involved in the incident, but not the shooter.  Trial Court Opinion, 3/23/22, at 1-2.

Ultimately, Appellant was arrested and charged with homicide, burglary, robbery – serious bodily injury, and criminal conspiracy.  After trial, a jury found Appellant guilty of felony murder, statutorily defined as second degree murder in Pennsylvania's Crimes Code, robbery – infliction of serious bodily injury, and conspiracy.  He was found not guilty of first degree murder.

On December 19, 2016, Judge David Cashman sentenced Appellant to serve a mandatory term of life in prison without the possibility of parole for his second degree murder conviction.  The court sentenced Appellant to serve a consecutive term of 10 to 20 years in prison for his criminal conspiracy conviction and imposed no further penalty on the robbery charge.  Appellant's co-defendant, Durham, was also convicted of second degree murder and sentenced to life imprisonment without parole.

By way of legal background, Pennsylvania's version of the felony murder rule is legislatively defined as murder of the second degree, and is set forth in 18 Pa.C.S. § 2502(b).  Murder of the second degree is a criminal homicide "when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." *Id*.  The phrase "perpetration of a felony," in turn, is limited to the eligible felonies that serve as the foundation for second degree murder:  the "act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping."  18 Pa.C.S. § 2502(d).  Thus, one may be convicted of second degree murder if a death occurs during the commission or attempted commission of an enumerated felony to which one was a principal or accomplice.  18 Pa.C.S. § 2502(b), (d).  Importantly, an individual may be convicted of

second degree murder regardless of an intent to kill; rather, "the malice necessary to make a killing, even an accidental one, murder, is constructively inferred from the malice incident to the perpetration of the initial felony." *Commonwealth ex rel. Smith v. Myers*, 261 A.2d 550, 553 (Pa. 1970); *Commonwealth v. Yuknavich*, 295 A.2d 290, 292 (Pa. 1972); *Commonwealth v. Tarver*, 426 A.2d 569, 573 (Pa. 1981). Thus, the only relevant intent is that to commit the underlying felony.

Moreover, the Crimes Code further provides that those convicted of second degree murder shall be sentenced to a mandatory term of life imprisonment, 18 Pa.C.S. § 1102,[3] and pursuant to the Prisons and Parole Code, without the possibility of parole, 61 Pa.C.S. § 6137(a)(1).[4] *See also Scott*, 284 A.3d at 191 (determining that those individuals convicted of second degree murder are ineligible for parole as a part of their sentence).

Appellant did not file a post-sentence motion or a direct appeal; however, proceeding under the Post Conviction Relief Act ("PCRA"), on November 4, 2020, the PCRA court reinstated Appellant's post-sentence and appellate rights. PCRA Court Order, 11/5/20, at 1.

---

[3] Section 1102(b) provides: "(b) Second degree.--Except as provided under section 1102.1, a person who has been convicted of murder of the second degree, of second degree murder of an unborn child or of second degree murder of a law enforcement officer shall be sentenced to a term of life imprisonment." 18 Pa.C.S. § 1102(b).

[4] Section 6137(a)(1) provides:

> The board may parole subject to consideration of guidelines established under 42 Pa.C.S. § 2154.5 (relating to adoption of guidelines for parole) or subject to section 6137.1 (relating to short sentence parole) and such information developed by or furnished to the board under section 6174 (relating to right of access to offenders), or both, *and may release on parole any offender to whom the power to parole is granted to the board by this chapter, except an offender condemned to death or serving life imprisonment. . . .*

61 Pa.C.S. § 6137(a)(1) (emphasis added).

Represented by counsel from the Abolitionist Law Center, Appellant filed a motion for modification of sentence, arguing that his mandatory sentence of life without parole was unconstitutional under the Eighth Amendment to the United States Constitution and Article I, Section 13 of the Pennsylvania Constitution. The trial court, per Judge Elliot Howsie, denied relief.[5] It rejected Appellant's argument that a sentence of life without parole when imposed on a defendant who did not kill or intend to kill as part of their crime was unconstitutional, dismissed his request that the court interpret the Pennsylvania Constitution's prohibition against cruel punishments to provide greater protections than the United States Constitution, and explained that arguments regarding the severity of punishment were policy questions for the legislature. Thus, the trial court denied Appellant's post-sentence motion on July 26, 2021. Appellant appealed to the Superior Court.

A three-judge panel of the Superior Court affirmed in an unpublished decision authored by Judge Judith Olsen.[6] *Commonwealth v. Lee*, 1008 WDA 2021, 2023 WL 3961802 (Pa. Super. filed June 13, 2023). Before the Superior Court, Appellant argued (again) that his mandatory sentence of life imprisonment without the possibility of parole was unconstitutional under the Eighth Amendment to the United States Constitution, as he was convicted of second degree murder and did not kill or intend to kill anyone during the commission of a robbery, and, thus, because of his diminished culpability, such a sentence was unduly harsh in relation to legitimate penological purposes, and out of step with modern national and international standards. While acknowledging the Superior Court's 2020 decision in *Commonwealth v. Rivera*, 238 A.3d 482, 501-03 (Pa. Super.

---

[5] Appellant's case was transferred to Judge Howsie upon Judge Cashman's retirement.

[6] The majority opinion was joined by Judge James Gardner Colins. Judge Alice Beck Dubow concurred in the result.

2020), in which the court rejected the same claim, Appellant nevertheless identified an analytical construct under the Eighth Amendment, which considers whether a punishment is grossly disproportionate to the offense, and which does so under a different standard than that previously applied only in the death penalty context, citing *Solem v. Helm*, 463 U.S. 277 (1983) and *Commonwealth v. Middleton*, 467 A.2d 841 (Pa. Super. 1983). Appellant's reasoning was that, under the United States Supreme Court's decisions in *Graham v. Florida*, 560 U.S. 48 (2010), *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), life without parole sentences were sufficiently similar to the death penalty that they could be unconstitutional when applied to people with categorically-diminished culpability based on their offense or characteristics.

Relying largely upon its own and our Court's prior precedent, the Superior Court rejected Appellant's logic, explaining that the Eighth Amendment does not require uniformity in penological approaches across the various states, and that there is no precedent holding that the Eighth Amendment prohibits a mandatory sentence of life without parole for an adult convicted of second degree murder. Moreover, the Superior Court determined that it was bound by its decision in *Rivera*, as well as prior case law, which determined that the imposition of the mandatory punishment of a life sentence without parole for second degree murder did not constitute cruel and unusual punishment under the United States Constitution. The Superior Court pointed out that *Graham*, *Miller*, and *Montgomery* all involved juveniles, who as a class are constitutionally distinct from adults for purposes of sentencing, and, thus, these United States Supreme Court precedents were inapplicable, as Appellant was not a juvenile at the time he committed the robbery.

The Superior Court then turned to Appellant's claim that his mandatory sentence of life imprisonment without the possibility of parole is unconstitutional under Article I, § 13 of the Pennsylvania Constitution. The court dismissed this argument in light of our Court's decisions repeatedly and unanimously holding that "the rights secured by the Pennsylvania prohibition against 'cruel punishments' are coextensive with those secured by the Eighth and Fourteenth Amendments." *Lee*, 2023 WL 3961802, at *4 (quoting *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 967 (Pa. 1982), *abrogated on other grounds by Commonwealth v. Freeman*, 827 A.2d 385 (Pa. 2003)). The Superior Court concluded that, because Appellant's Eighth Amendment claim failed, his Article I, Section 13 claim likewise failed, and affirmed Appellant's judgment of sentence.

Judge Dubow concurred, agreeing with the majority's conclusion that the court was bound by existing case law which upholds the mandatory imposition of life without parole for a defendant convicted of second degree murder under both the United States and Pennsylvania Constitutions. Judge Dubow suggested, however, that in light of changes in other states' case law and research and policy concerns regarding the criminal justice system, our Court should revisit the factors set forth in *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), and reconsider whether a mandatory minimum sentence of life without parole imposed for all second degree murder convictions is constitutional under Article I, Section 13 of the Pennsylvania Constitution. Appellant sought further review in our Court.

## II. Issues

We granted review limited to two issues. We first agreed to address whether Appellant's mandatory sentence of life imprisonment with no possibility of parole is violative of the Eighth Amendment to the United States Constitution where he was convicted of second degree murder but did not kill or intend to kill and, therefore, had

categorically diminished culpability under the Eighth Amendment. We also granted review to consider whether Appellant's mandatory sentence of life imprisonment with no possibility of parole is constitutional under Article I, Section 13 of the Pennsylvania Constitution, where he did not kill or intend to kill, and whether Article I, Section 13 provides greater protections in those circumstances than the Eighth Amendment to the United States Constitution. *Commonwealth v. Lee*, 313 A.3d 452 (Pa. 2024) (order).

The constitutional validity of a statute presents a pure question of law and, as with any question of law, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Baker*, 78 A.3d 1044, 1047 n.3 (Pa. 2013); *Robinson Township, Washington County v. Commonwealth*, 83 A.3d 901, 943 (Pa. 2013). Moreover, regarding any constitutional challenge to legislation, the challenger bears the heavy burden of demonstrating that the statute "clearly, palpably, and plainly violates the Constitution," as we presume that our sister branches act in conformity with the Constitution. *Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006). Finally, while the parties do not expressly characterize this appeal as a facial or an as-applied challenge to a mandatory sentence of life without parole, we conclude Appellant raises a facial challenge. Specifically, a facial contest examines a law's constitutionality based on its text alone without considering the facts or circumstances of a particular case. The court does not look beyond the statute's explicit requirements or speculate about hypothetical or imaginary cases. *Germantown Cab Company v. Philadelphia Parking Authority*, 206 A.3d 1030, 1041 (Pa. 2019). Conversely, an as-applied contest of a statute is more limited. Such approach does not assert that a law is unconstitutional as written, but only that its application to a particular person under particular circumstances deprives that individual of a constitutional right. While "as-applied challenges require application of the [law] to be ripe, facial challenges are different, and ripe upon mere enactment of the

ordinance." *Philadelphia Entertainment & Development Partners, L.P. v. City of Philadelphia*, 937 A.2d 385, 392 n.7 (Pa. 2007). Here, Appellant challenges the mandatory nature of the life without parole sentencing scheme as unconstitutional on the basis that the statutory framework fails to provide all individuals convicted of felony murder a process by which to determine individual culpability. As the statutory scheme, by its terms, does not provide any process in which an individual's culpability may be taken into account, we conclude that Appellant's attack is a facial challenge to a mandatory sentence of life without parole for second degree murder.

### III. Background Considerations

### A. The Felony Murder Doctrine

Before analyzing the two issues on which we granted review, we believe it beneficial to consider, as a general matter, the meaning and origins of the felony murder rule and a life without parole sentence. Broadly stated, felony murder is a murder committed in the course of the commission of another felony. The essential element which distinguishes first degree from lesser grades of murder is the specific intent to kill. *Commonwealth v. Moore,* 373 A.2d 1101 (Pa. 1977) (citing cases). In contrast, the intent necessary to establish felony murder is constructively inferred from the malice incident to the perpetration of an underlying felony. *Tarver,* 426 A.2d at 573. Thus, under the felony murder rule, and unlike most other crimes, the defendant's intent as to the commission of a murder is immaterial. *See Myers*; *Yuknavich*; *Tarver, supra*.

The origin of the common law felony murder doctrine is uncertain, and can be traced to different sources. Dolly Prabhu, *A Lifetime for Someone Else's Crime: The Cruelty of Pennsylvania's Felony Murder Doctrine*, 81 U. Pitt. L. Rev. 439, 443-45 (2019). However, a 1797 description of the felony murder doctrine, written by Sir Edward Coke, is often pointed to as the source of the common law rule:

> If the act be unlawful it is murder. As if A. meaning to steale a deere in the park of B., shooteth at the deer, and by the glance of the arrow killeth a boy that is hidden in a bush: this is murder, for that the act was unlawfull, although A. had no intent to hurt the boy, nor knew not of him. But if B. the owner of the park had shot at his own deer, and without any ill intent had killed the boy by the glance of his arrow, this had been homicide by misadventure, and no felony.

*Id*. at 443 (quoting *People v. Aaron*, 299 N.W.2d 304, 309 (Mich. 1980) (quoting Edward Coke, The Third Part of the Institutes of the Laws of England 56 (E. & R. Brooke 1797))). Yet, this description appears to have been an unwarranted extension of another passage, written by the 13th century English jurist Henry de Bracton, who offered that an unintentional killing during the commission of a lawful activity was not blameworthy; however, an unintentional killing which occurred during the commission of unlawful activity was. *Id*. at 443-44. The difference being that, while these descriptions suggest that a killing which occurred during the course of a felony would be "blameworthy" and unlawful, there was no suggestion in Bracton's understanding that such an act would constitute *murder*, as proffered by Sir Coke, a crime at the time which was limited in nature, and that today, except for felony murder, requires a culpable *mens rea* in regard to the act of killing. *Id*. at 444. This distinction, however, as a practical matter, made little difference, as at early common law, virtually all felonies were punishable by death; thus, it was "of no particular moment whether the condemned was hanged for the initial felony or for the death accidentally resulting from the felony." *Aaron*, 299 N.W.2d at 310-11. Notably, in England, the birthplace of the felony murder doctrine, the rule was rarely invoked and ultimately eliminated in 1957. Prabhu, at 444.

Various justifications undergird the felony murder doctrine, and commentators have differed on the initial justifications in English common law. Some argue that there was little need for the felony murder doctrine as all felonies traditionally warranted capital

execution; however, execution rates varied according to the felony. Michael T. Moore, Jr., *Felony Murder, Juveniles, and Culpability: Why the Eighth Amendment's Ban on Cruel and Unusual Punishment Should Preclude Sentencing Juveniles Who Do Not Kill, Intend to Kill, or Attempt to Kill to Die in Prison*, 16 Loy. J. Pub. Int. L 99, 104-05 (2014). One modern justification for the doctrine is to deter accidental or negligent deaths during the commission of a felony. The other primary justification is retribution, which is rooted in its common law ancestry. *Id*. at 105. Moreover, some contend that the felony murder rule is compatible with notions of law and order, protecting the public against those who introduce unwarranted and unnecessary threats of death into citizens' daily lives, and so acts as a safeguard against the risks of armed robbery, burglary, rape, and similar crimes, communicating to felons the consequences of their actions and comforting victims of such crimes, by reflecting the significance of an innocent victim's life. James J. Tomkovicz, *The Endurance of the Felony-Murder Rule: A Study of the Forces That Shape Our Criminal Law*, 51 Wash. & Lee L. Rev. 1429, 1463-65 (1994).

American felony murder principles were enacted primarily by legislatures in the mid-19th century, and were developed in an effort to reform the law of homicide by codifying its objective and subjective elements. Guyora Binder, *The Culpability of Felony Murder*, 83 Notre Dame L. Rev. 965, 976-79 (2008). Numerous states adopted felony murder statutes, which were initially applied to all felonies regardless of their dangerousness. The first felony murder statute was passed in Illinois in 1827 and, by the end of the 19th century, nineteen states had adopted differing kinds of felony murder statutes. Moore, Jr. at 104-05.

However, early on, both the English and American courts observed the harshness of the rule and began to limit its application. Jason M. Cieslik, J.D., *A New Approach to Felony Murder in Illinois*, 42 N. Ill. U. L. Rev. 243, 246-48 (2022). In many cases, the

felony murder rule was restricted to felonies that involved a high risk that someone might be killed, and states that embraced the felony murder doctrine have limited the rule by, *inter alia*, setting forth specific felonies which would qualify and strictly interpreting proximate or legal cause. *Id*. Though still applied in most states, the doctrine has been limited by every state in some regard to diminish its harshness, confining its application to felonies inherently dangerous to life; some applying the rule only to those who committed the actual killing; and a few abolishing the doctrine altogether. Prabhu, at 445. Another approach taken by some states is to limit the severity of the punishment, such as by imposing life without parole sentences only for intentional murder or especially violent crimes, or setting the minimum sentence for felony murder as low as five years imprisonment. *Id*.

As for Pennsylvania's experience with the felony murder doctrine, after gaining independence from England, a number of the new states began legislative efforts to codify the crime of murder. This was done, in part, to limit the use of the death penalty. Legislative reform in the late 1700s involved dividing murder into degrees, and this uniquely American approach to homicide jurisprudence originated with Pennsylvania's 1794 statute. As discussed in greater detail below, this statute was a result of a reformation movement to reduce and differentiate penalties that was inspired by Enlightenment figures such as Montesquieu and Beccaria, and was promoted by, *inter alia*, James Wilson, Benjamin Rush, and Pennsylvania Supreme Court Justice William Bradford. Guyora Binder, *The Origins of American Felony Murder Rules*, 57 Stan. L. Rev. 59, 119 (2004). Indeed, a 1792 report by Justice Bradford for Pennsylvania's Governor recommended that the death penalty should be reserved for "deliberate assassination." *Id*. This report prompted a resolution by one legislative house that "all murder . . . perpetrated by means of poison, or by lying in wait, or by any other kind of wilful,

deliberate and premeditated killing shall be deemed murder in the first degree," and that all other kinds of murder shall be murder in the second degree. *Id*. The next year, a bill along these lines was presented to both houses; however, during legislative debates, the offense of murder committed in the course of certain enumerated felonies was added to the category of first degree murder. *Id*.

While the 1794 statute did not formulate a felony murder rule, or define the elements of murder at all, it identified participation in certain felonies as a grading element that aggravated murder liability. Thus, it prescribed that "all murder, which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder of the second degree . . . ." Act of Apr. 22, 1794, ch. 1766, § 2, 1794 Pa. Laws 186, 187.

After various amendments over the years, as noted above, Pennsylvania's current felony murder rule, statutorily identified as murder of the second degree, is set forth in 18 Pa.C.S. § 2502(b). Murder of the second degree is a criminal homicide "when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." *Id*. The phrase "perpetration of a felony" in turn, restricts the felonies that serve as the foundation for second degree murder to the "act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S. § 2502(d). Thus, if a death occurs during the commission or attempted commission of an enumerated felony to which an individual was a principal or accomplice, that person may be charged with second degree murder.

## B. Life Without Parole

Parole is a penological disposition for prisoners who appear to have the potential for rehabilitation outside of prison. Parole does not alter the sentence, and the convict remains in the legal custody, and under the control, of the state. A parolee is subject to the conditions of parole and a return to prison for their breach. *Com. ex rel. Sparks v. Russell*, 169 A.2d 884, 885 (Pa. 1961). Parole is a matter of grace and mercy shown to a prisoner who has demonstrated to the Parole Board's satisfaction his future ability to function as a law-abiding member of society upon release before the expiration of his maximum sentence. *Rogers v. Pennsylvania Board of Probation & Parole*, 724 A.2d 319, 322-23 (Pa. 1999). Thus, as the phrase suggests, a sentence of life without the possibility of parole prohibits a prisoner from eligibility for such disposition. The Crimes Code *mandates* a life without parole sentence for those convicted of second degree murder. 61 Pa.C.S. § 6137(a)(1).

As to the origins of a sentence of life without parole, such punishment did not exist at common law. In the early 20th century, the reformist zeal of the Progressive Era spawned greater enthusiasm for early release, beginning a 70-year expansion of work-release programs and halfway houses, and earlier parole-eligibility dates. Notes, *A Matter of Life and Death: The Effect of Life-Without-Parole Statutes on Capital Punishment*, 119 Harv. L. Rev. 1838, 1839 (2006). At the same time, effective prison sentences in states that adopted parole grew longer, as legislatures and judges felt free to impose higher sentences when they knew that those sentences might not be served in full. Moreover, many parolees found it difficult to abide by their conditions of parole. A list of Progressive Era parole violations in various states included going into debt, public speaking, cohabitation outside marriage, and political activity. *Id*. The end result was that the availability of parole often led to effectively longer sentences.

From the early 20th century through the 1970s, the sentence of life without parole, as we now know it, did not exist, as this period was characterized by increased availability of parole and, more broadly, increased indeterminate sentencing. The federal government reduced parole eligibility for life prisoners to ten years in 1976. *Id*. at 1840. By then, American support for the death penalty had reversed several times, decreasing until the Supreme Court struck down all existing death penalty laws in *Furman v. Georgia*, 408 U.S. 238 (1972), and subsequently increasing as state after state repassed capital statutes as well as life without parole statutes. *Id*. at 1840-41. In Pennsylvania, a life without parole sentence did not exist until the Parole Act of 1941, which gave the Parole Board the exclusive power to grant parole for all individuals *except* those sentenced to life, essentially making every life sentence a life without parole sentence by default.

Finally, that felony murder convictions in Pennsylvania carry a mandatory sentence of life imprisonment without parole, makes it an arguable outlier compared to most other states. Indeed, only four other states have a similar mandatory life without parole sentence, without exceptions, for second degree murder. *See* Iowa, Iowa Code § 707.2, § 902.1; Louisiana, La. Rev. Stat. § 14:30.1(A)(2), § 14:30.1(B); Mississippi, Miss. Code § 97-3-19(2)(e), § 47-7-3(1)(c); North Carolina, N.C. Gen. Stat. § 14-17(a).[7]

### IV. Eighth Amendment

We first consider Appellant's arguments under the Eighth Amendment to the United States Constitution. Specifically, Appellant sets forth what he believes to be the

---

[7] We point out that there is some controversy as to the number of states that mandate a life without parole sentence, without exception, for felony murder. *See*, *e.g.*, Philadelphia District Attorney's Office Brief at 8 (asserting two states); Office of the Attorney General Brief at 8 (asserting eight states); Scholars of the Eighth Amendment Brief at 22 (asserting nine states); Pennsylvania Prison Society Brief at 23 (asserting 10 states); The Sentencing Project Brief at 7-8 (asserting 11 states). We merely note that certain of the states counted by these *amici* contain the possibility of compassionate parole or release. *See*, *e.g.*, Arizona, A.R.S. § 31-233; Florida, F.S.A. § 947.149; South Dakota, SDCL § 24-15A-55.

two lines of United States Supreme Court case law interpreting the Eighth Amendment: (1) decisions considering whether a term of years sentence is grossly disproportionate to the offense; and (2) cases analyzing whether a capital punishment or life without parole sentencing practice is excessive as applied to a category of offenders or offenses. Appellant submits that only the second categorical approach is applicable in this matter.

Supporting his categorical approach challenge, Appellant traces a line of high Court decisions beginning with *Enmund v. Florida*, 458 U.S. 782 (1982), in which the United States Supreme Court recognized that defendants convicted of felony murder who did not kill or intend to kill have a categorically diminished culpability and could not be sentenced to death. Appellant notes that the *Enmund* decision differentiated the culpability for sentencing purposes of those who had a specific intent to kill and those convicted of felony murder. Appellant stresses that the *Enmund* Court emphasized that the focus was on determining the culpability of the defendant which in turn impacted the proportionality of the punishment. According to Appellant, defendants who did not kill, attempt to kill, or intend to kill are less morally culpable and, thus, less deserving of the most severe punishments.

Appellant then offers a more recent line of cases involving the category of juvenile offenders. Appellant contends that, beginning with *Graham*, and including *Miller*, the high Court has applied a categorical approach previously reserved for the death penalty and expanded it to a sentence of life without parole. In Appellant's view, the Supreme Court reasoned that, because a life without parole sentence was sufficiently similar to the death penalty, the same level of scrutiny and protection was required under the Eighth Amendment.

Specifically, under this approach, courts survey whether there are "'objective indicia of society's standards, as expressed in legislative enactments and state practice,'

to determine whether there is a national consensus" rejecting the sentence as excessive. *Graham*, 560 U.S. at 61. Appellant proffers that this analysis also includes recent trends among the states and internationally with respect to imposing a particular sentence upon a certain category of offenders or type of offense. Appellant maintains that courts also assess whether the punishment is disproportionate when comparing the culpability of the class of offender with the severity of the punishment and whether the sentence adequately serves legitimate penological goals when applied to the particular category of offenders or offense. Appellant stresses the focus on culpability in this series of cases, specifically, that it is the defendant's culpability and not that of the other actors who committed the crime, emphasizing that those defendants who did not kill, attempt to kill, or intend to kill are less morally culpable than those who do and, thus, less deserving of the most severe punishment. Indeed, Appellant highlights that the *Graham* Court stressed that "a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability," first because of youth, and second because of the nature of the offense. *Id.* at 69. According to Appellant, these decisions established that the high Court's jurisprudence prohibits the most severe punishments for categories of offenders with diminished culpability and are applicable to one sentenced to life without parole with no meaningful opportunity for release.

Applying these tenets to the matter *sub judice*, Appellant proffers that the *mens rea* required in order to be convicted of second degree murder is merely the intent to engage in the underlying felony, as the malice necessary to support murder, even an accidental one, is constructively inferred from the malice incident to committing the initial felony. Here, Appellant claims that he did not kill or have the intent to kill, and indeed, was found not guilty of first degree murder, and, thus, has a categorically diminished culpability under the Eighth Amendment. Continuing, Appellant asserts that, because he

had no intent to kill, and a punishment of life without parole is sufficiently similar to the death penalty, a life without parole sentence is unduly harsh in relation to legitimate penological purposes, and so it is violative of the Eighth Amendment. Moreover, Appellant maintains that Pennsylvania's punishment of life without parole for second degree murder is severe and outside of the national consensus and international standards and is inconsistent with legitimate penological goals, as it fails to promote deterrence, rehabilitation, and incapacitation. Appellant submits that even retribution — that is, punishment in proportion to the heinousness of the criminal act — is unprincipled in this area, as the life without parole sentence is identical to that imposed upon those whose culpability is greater.

Numerous *amici* have submitted briefs on whether a punishment of life without parole for second degree murder violates the Eighth Amendment. While a number of these briefs largely track Appellant's arguments, certain contentions merit mention. Specifically, *Amici* Scholars of Eighth Amendment Law stress the comparative nature of a sentence of life without parole to the death penalty and urge that the two should be treated similarly. In this vein, *Amici* argue that for individuals who did not kill or intend to kill, the severe punishment of mandatory life imprisonment without parole violates the Eighth Amendment. While observing that the United States Supreme Court's categorical approach was first recognized in the capital context and was extended to noncapital punishments when it was applied to juveniles, *Amici* submit that this approach should be extended to classes of adults with a diminished culpability based upon their characteristics or the nature of their offenses. Finally, Juvenile Law Center, Youth Sentencing & Reentry Project and Philadelphia Lawyers for Social Equity highlight that current research indicates that there is little difference developmentally between young

people under the age of 18 and young adults 18 and older, rendering extreme punishments for felony murder inappropriate for both categories of adults.

The Commonwealth counters first by emphasizing the presumption of constitutionality that an enactment by the General Assembly enjoys — unless clearly, palpably and plainly violative of the Constitution — and the heavy burden of persuasion on challengers to the constitutionality of a statute. On the merits, the Commonwealth asserts that the Eighth Amendment does not require strict proportionality between crime and sentence, but only prohibits sentences grossly disproportionate to a crime. The Commonwealth offers the three-prong test for evaluating whether a sentence is grossly disproportionate, which assesses: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed upon other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions, citing *Solem*, 463 U.S. at 292. The Commonwealth then pivots and challenges Appellant's reliance upon *Miller*. According to the Commonwealth, while *Miller*, which focused on juveniles, may have altered the three-prong test to some degree, it did not invalidate a punishment of life without parole altogether, but focused on the fact that juveniles do not have the mental capacity to appreciate their actions. Thus, while seemingly applying a categorical approach, the Commonwealth maintains that the *Miller* Court recognized that life without the possibility of parole is not cruel or unusual as applied to adults, and offers various decisions finding that *Miller* does not apply to adults who possess the same or similar cognitive disabilities as minors, citing *Commonwealth v. (Avis) Lee*, 206 A.3d 1, 9 (Pa. Super. 2019); *Commonwealth v. Olds*, 192 A.3d 1188, 1196 (Pa. Super. 2018) (finding that consistent with *Miller*, a state may set a mandatory maximum term of life imprisonment so long as defendants receive an opportunity for parole based upon demonstrated maturity and rehabilitation). Accordingly, the Commonwealth believes a

mandatory sentence of life imprisonment without parole for a conviction for second degree murder, even for a non-slayer, is not grossly disproportionate.

The Commonwealth also rejects Appellant's reliance upon the United States Supreme Court's decisions such as *Enmund* (barring death penalty for person convicted of felony murder who was not the slayer), as those decisions involved capital punishment, the most severe punishment requiring special considerations regarding its application to certain categories of offenders. Likewise, the Commonwealth distinguishes Appellant's reliance upon cases such as *Graham* and *Miller*, as those decisions involved juveniles, a unique category of offenders. The Commonwealth challenges Appellant's attempt to characterize persons such as himself who were convicted of felony murder, but who were not the actual slayer, as a special class akin to juveniles who had diminished culpability, and submits that this argument is actually a challenge to the felony murder rule which rests culpability upon each participant in the underlying felony equally, and not a challenge to his sentence. The Commonwealth, citing various decisions by our Court, maintains that when one engages in certain enumerated felonies and a killing occurs, the finder of fact is to infer the killing was malicious as the individual engaged in a felony of such a dangerous nature and the actor knew or should have known that death might result from the felony. Thus, the malice necessary to render a killing, even an accidental one, a murder, is constructively inferred from the malice incident to the perpetration of the initial offense. The Commonwealth points out that a greater penalty is in fact imposed for murder of the second degree than imposed for murder of the third degree, even though third degree murder is malicious. Ultimately, while the Commonwealth acknowledges that there may be persuasive arguments why a non-slayer should not be held to the same degree of culpability as the slayer, it stresses that these are policy decisions for the General Assembly.

Furthermore, the Commonwealth argues that the Eighth Amendment does not require strict proportionality between crime and sentence, but forbids only extreme sentences which are "grossly" disproportionate to the crime. Commonwealth's Brief at 8. The Commonwealth offers that, in *Miller*, the United States Supreme Court held that life imprisonment without parole was unconstitutionally cruel when imposed upon a defendant convicted of murder who was under the age of 18 at the time the crime was committed. According to the Commonwealth, however, the high Court did not strike life without parole *in toto*, but centered its categorical analysis on the fact that juveniles, who fall within a unique category of offenders, lack the mental capacity and maturity to appreciate their actions, and possess an underdeveloped sense of responsibility. Therefore, while a juvenile is not absolved of responsibility for his or her actions, he or she is not as morally reprehensible as an adult. As a result, the Commonwealth concludes that a sentence of life without parole for one convicted of second degree murder, even for a non-slayer, is not grossly disproportionate, and so is constitutional under the Eighth Amendment.

Two *Amicus* briefs were filed on behalf of the Commonwealth. The Office of the Attorney General explains that, while policy arguments may be compelling to alter the sentence of life without parole for one convicted of second degree murder, it stresses that policy determinations are for the legislative and executive branches, and not the judiciary. While focusing on the constitutionality of a sentence of life without parole for second degree murder under the Pennsylvania Constitution, *Amicus* offers that the Governor's expanded use of commutation could be an effective way forward. Similarly, the Pennsylvania District Attorneys Association points out that significant policy considerations are raised by Appellant and *amici* in support of him, and are worthy of exploration, however, they are directed to the "wrong body," and are more properly made

to the General Assembly and Governor; indeed, *Amicus* notes that most of the *amicus* briefs in support of Appellant offer only policy arguments and are devoid of constitutional analysis.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.[8] The prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). This right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense. *Id*. (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). Thus, the idea of proportionality is central to the Eighth Amendment. *Graham*, 560 U.S. at 59.

What constitutes "cruel and unusual punishments" has been defined in two lines of United States Supreme Court decisions. In the first line of decisions, the high Court considered the proportionality between the crime committed and the sentence imposed. The Court has been clear, however, that the Eighth Amendment does not mandate strict proportionality between the crime and sentence. Indeed, "only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality" is cruel and unusual punishment implicated. *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (Kennedy, J., concurring). Appellant does not rely upon a strict proportionality approach, however, and, thus, we turn to the second line of decisions embodying a categorical approach.

In a series of Eighth Amendment cases, the United States Supreme Court has adopted a categorical approach to determining whether a punishment was violative of the

---

[8] The Eighth Amendment applies to the states by virtue of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666-67 (1962).

Eighth Amendment, primarily in the arena of juvenile offenders. The high Court first recognized this categorical approach in the capital context. Beginning with *Enmund v. Florida*, 458 U.S. 782 (1982), the United States Supreme Court, in an opinion authored by Justice Byron White, recognized that defendants convicted of felony murder who did not kill, attempt to kill, or intend to kill have a categorically diminished culpability and so could not be sentenced to death. The high Court found that, in the context of a robbery that ended in murder, Florida's identical treatment of both Enmund, who drove the getaway vehicle and who did not kill or intend to kill, and the robbers who killed the victims, was impermissible under the Eighth Amendment. *Id*. at 798. The Court noted that "American criminal law has long considered a defendant's intention — and therefore his moral guilt — to be critical to 'the degree of [his] criminal culpability.'" *Id*. at 800 (citation omitted). Thus, the Supreme Court determined that, for purposes of capital punishment, criminal culpability of one who did not kill, attempt to kill, or intend to kill, must be limited to participation in the underlying felony, and any punishment must be tailored to personal responsibility and moral guilt. *Id*. at 801; *see also Kennedy v. Louisiana*, 554 U.S. 407 (2008) (finding capital punishment excessive when applied to rape where the defendant did not kill or intend to take a life).

Twenty-three years later, in *Roper v. Simmons*, 543 U.S. 551 (2005), the Court concluded that the Eighth Amendment prohibits capital punishment for murderers who were under 18 at the time of their crimes. Justice Anthony Kennedy, writing for the majority, relied on evolving scientific knowledge regarding adolescent development, particularly that juveniles have a relative "lack of maturity" and an "underdeveloped sense of responsibility;" youth are more vulnerable to "outside pressures" or "peer pressure;" and a juvenile's character is "not as well formed" as that of an adult. *Id*. at 569-70. The high Court, adopting a categorical rule, prohibited the death penalty for defendants who

committed their crimes as juveniles, due to their lessened culpability, reasoning that they were less deserving of the most severe punishment.

Five years later, in *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court, in an opinion again penned by Justice Kennedy, held that the mandatory life without parole sentencing of juvenile nonhomicide offenders constitutes cruel and unusual punishment based upon the limited culpability of youth as well as the severity of life without parole sentences, as akin to capital punishment. Like in *Roper*, the Court emphasized the distinctive attributes of youth which undercut any penological justification for imposing a sentence of death. Importantly, the *Graham* Court likened life without parole for juveniles to the death penalty, implicating a line of capital decisions in which sentencing authorities were required to consider the defendant's characteristics and the details of the offense that he committed before imposing capital punishment. It bears noting, however, that *Graham* did not bar a sentence of life without parole for offenders who were under 18 and committed *homicide*. The *Graham* Court stated: "There is a line 'between homicide and other serious violent offenses against the individual.'" *Id*. at 69.

This changed two years later in the high Court's landmark decision in *Miller v. Alabama*, 567 U.S. 460 (2012). In *Miller*, the Supreme Court addressed the issue of whether the imposition of a mandatory sentence of life imprisonment without parole upon juveniles for their conviction of murder violated the Eighth Amendment's prohibition against cruel and unusual punishment. The Supreme Court, in an opinion authored by Justice Elena Kagan, first explained the rationale behind the Eighth Amendment as guaranteeing "individuals the right not to be subjected to excessive sanctions" which right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." *Id*. at 469 (citations omitted). In finding such mandatory sentences were barred, the Court relied upon two lines of

precedent that reflected the Court's concern for proportionate punishment. *Id.* at 470. The first line of decisions embraced categorical bans on sentencing practices based on the incongruity between the culpability of the class of offenders and the severity of a penalty. The Court reasoned that juveniles are constitutionally distinct from adults for sentencing purposes due to their diminished culpability, lack of maturity, underdeveloped sense of responsibility, and vulnerability to outside pressures and negative influences, as well as the greater prospects for reform, which rendered them less deserving of the most severe penalties. *Id.* at 471. In describing these most severe penalties, the high Court, relying on *Graham*, again likened a sentence of life without parole to the death penalty, noting that both sentences possessed common characteristics "shared by no other sentences." *Id*. at 474. The Court made clear that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." *Id.* at 473. The second line of decisions upon which the Court relied involved the imposition of capital punishment which required sentencing authorities to "consider the characteristics of a defendant and the details of his offense before sentencing him to death." *Id.* at 470. The *Miller* Court determined that "the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id.*

Significantly, the Court explained that mandatory life imprisonment without parole could not be imposed upon minors absent an individualized consideration of "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. Finally, the *Miller* Court stressed that, after individualized assessment of the juvenile defendant, a mandatory life without parole sentence for a juvenile could still be a viable sentence. The high Court's *Miller* decision was consistent with its line of cases concerning certain classes of individuals subject to a sentence of life

without parole, and, in the case of juveniles, mandated an individualized assessment of circumstances, such as "immaturity, impetuosity, and failure to appreciate risks and consequences," the defendant's family and home environment, the circumstances of the homicide, and the possibility of rehabilitation. *Id.* at 477-78. *Miller* was later clarified in *Montgomery*, *supra*, as providing not merely a procedural protection but, critically, a substantive federal constitutional protection, making retroactive *Miller*'s prohibition against sentencing juvenile homicide offenders to a mandatory sentence of life in prison without possibility of parole. Most recently, however, in *Jones v. Mississippi*, the Court decided that a juvenile homicide offender *may* be sentenced to life without parole, and that the sentencing tribunal was not required to make a separate factual finding regarding the minor's permanent incorrigibility before imposing a discretionary sentence of life without parole on such offender. 593 U.S. 98, 106-07 (2021). Rather, the sentence must not be mandatory, and a sentencer must follow a certain process – considering an offender's youth and attendant characteristics, diminished culpability and heightened capacity for change – before imposing a life without parole sentence. *Id*. 108-09. The Court reasoned that such sentencing procedure ensured that the sentencing tribunal afforded individualized consideration to, among other things, the defendant's "chronological age and its hallmark features." *Id*. at 109.

While broader principles regarding culpability and the requirement of individualized assessment before imposing a mandatory sentence of life without parole may be drawn from these decisions, it is inescapable that the categorical focus in all of these cases was either on capital punishment, or that the offender was under the age of 18.[9] In *Miller*, the

---

[9] To illustrate, in *Harmelin v. Michigan*, 501 U.S. 957 (1991), a defendant was sentenced to a mandatory life without parole term for possessing more than 650 grams of cocaine. The Supreme Court rejected Harmelin's constitutional challenge to his sentence, reasoning that "a sentence which is not otherwise cruel and unusual" does not "becom[e] so simply because it is 'mandatory.'" *Id*. at 995. Thus, while the high Court mandated (continued…)

Supreme Court noted that "*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472. Indeed, the decisions were based upon science and the physical distinctions between adult and juvenile brains. For example, in *Graham*, the Supreme Court distinguished between the two as follows:

> [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. See Brief for American Medical Association et al. 16-24; Brief for American Psychological Association et al. 22-27. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U.S., at 570, 125 S.Ct. 1183. It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."

*Graham*, 560 U.S. at 68.

Thus, for Eighth Amendment purposes, "children are constitutionally different from adults for purposes of sentencing." *Montgomery*, 577 U.S. at 206, and the line of high Court decisions in *Miller*, *Montgomery*, and *Jones* did not question or reform the age-based bright line first drawn in *Roper*. While certain scholarship may suggest a broader

---

individualized sentencing in the context of capital punishment, it has refused to extend that requirement to nonjuvenile, noncapital cases. Moreover, the *Miller* Court distinguished its prior decision in *Harmelin*, noting that it had "nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders." *Miller*, 567 U.S. at 481.

interpretation of these cases,[10] we find that the United States Supreme Court's decisions employing a categorical approach, whether involving the death penalty with diminished culpability, or regarding the sentencing of the distinct class of juveniles to mandatory life without parole are, under the Eighth Amendment, distinguishable from an analysis of the mandatory sentencing of adults to life without parole and, at least at this juncture, without additional guidance from the high Court, provides no relief to Appellant.

## V. Article I, Section 13

### A. Arguments

Having first looked to the United States Constitution and determining that it cannot be said that Appellant's sentence of mandatory life imprisonment without parole for his conviction of second degree murder constitutes cruel and unusual punishment under the Eighth Amendment, we continue with Appellant's contention that our state constitution affords greater safeguards than its federal counterpart.

In addressing the constitutionality of a mandatory sentence of life without parole for felony murder under the Pennsylvania Constitution, Appellant stresses, as an introductory matter and throughout his brief, that felony murder does not require any level of criminal intent with respect to the death that occurred during the perpetration of the underlying felony, but rather the malice essential for a conviction of murder is imputed to the defendant from the intent to commit the underlying felony. Moreover, Appellant emphasizes that the defendant need not directly cause the death of the victim in order to be found guilty of felony murder; rather, when a killing occurs during the commission of certain felonies, the actual killer and all who participated — including, for example, the driver of a getaway vehicle — are all equally guilty of second degree murder. Appellant

---

[10] See Gertner, *Miller v. Alabama:  What It Is, What It May Be, and What It Is Not*, 78 Mo. L. Rev. 1041 (Fall 2013); O'Hear, *Not Just Kids Stuff?  Extending Graham and Miller to Adults*, 78 Mo. L. Rev. 1087 (Fall 2013).

points out that the felony murder rule has faced harsh condemnation, including an admonishment by our Court in *Myers*, 261 A.2d at 553-54 (recognizing criticism of the rule as "highly punitive and objectionable as imposing the consequences of murder upon a death wholly unintended," characterizing it as "non-essential," and offering that it is "very doubtful that it has the deterrent effect its proponents assert"). Finally, Appellant challenges the broad application our 1982 decision in *Zettlemoyer*, in which we found the federal constitutional right against cruel and unusual punishment, and the state constitutional right against cruel punishment, to be co-extensive; he offers that members of our Court have suggested that the decision was claim specific and did not foreclose the possibility that our Constitution provides greater protection than the federal charter, citing *Baker*, 78 A.3d at 1053 (Castille, C.J., concurring) (explaining that "[t]his Court is not obliged by existing precedent to proceed in lockstep in approaching state constitutional 'cruel punishment' claims" and rejecting notion that "all claims arising under Article I, Section 13 should be treated as if they were subject to the same standards that would govern an equivalent Eighth Amendment claim").

Appellant, recognizing the four-prong test for determining whether greater rights exist under the Pennsylvania Constitution than its federal counterpart, then sets forth a comprehensive *Edmunds* analysis. Beginning with the text of the two provisions, Appellant contends that the Pennsylvania Constitution's prohibitory language against "cruel punishments inflicted," Pa. Const. art. I, § 13, is broader in protection than the textually distinct amendment to the United States Constitution, which safeguards against "cruel and unusual punishments." U.S. Const. amend. VIII. Appellant focuses on the term "unusual" contained in the federal Constitution and asserts that this term has been given a distinct meaning, as interpreted by the United States Supreme Court, citing *Harmelin*, 501 U.S. at 967 (noting the difference between "cruel" and "unusual" in the

federal Constitution); *see also Bucklew v. Precythe*, 587 U.S. 119, 130-31 (2019) (explaining that "Americans in the late 18th and early 19th centuries described as 'unusual' governmental actions that had 'fall[en] completely out of usage for a long period of time'").

According to Appellant, Pennsylvania's failure to use the term "unusual" in conjunction with the term "cruel" is meaningful. Appellant avers that, as a result, the Pennsylvania provision is broader. Specifically, the Pennsylvania provision is not burdened with the requirement that a challenged punishment be both contrary to the common law and not continually imposed for a long period under the common law, to be deemed to be unconstitutional.

Appellant proffers that the history of Section 13 of our Constitution confirms that the framers had a unique understanding of cruelty, believing only deterrence and reformation justified a punishment, and anything that was unnecessary to support those aims was considered to be unjustly harsh, *i.e.*, cruel. Appellant's Brief at 17 (citing Kevin Bendesky, *"The Key-Stone to the Arch": Unlocking Section 13's Original Meaning*, 26 U. Pa. J. Const. L. 201, 201 (2023)). Appellant adds that the theme of proportionate crimes also served as a foundation of the history of the constitutional provision and that these principles — that the punishments should be proportionate to the needs of deterrence and rehabilitation — became the basis for the Constitution's prohibition against "cruel punishments." Bendesky at 241. According to Appellant, these principles were historically aligned with life without parole sentences, as exemplified by the routine use of clemency for those who had demonstrated rehabilitation, at least until the state's statutory mandate that those serving a life sentence be ineligible for parole and the recent decline in the use of commutation.

As to case law from other jurisdictions, Appellant points to certain states which interpret their constitution's "cruel" or "cruel or unusual" punishment clauses as providing

broader protection than the Eighth Amendment to the federal Constitution. While recognizing that other states have either found their constitutional provision to be co-extensive with the Eighth Amendment, or have not engaged in a substantive analysis of the matter, Appellant submits that these decisions represent a trend towards finding independent meaning to state constitutions, and urges our Court to follow these states and find that our state's cruel punishments clause provides greater protection than the Eighth Amendment.

Appellant also offers that policy considerations, especially Pennsylvania's outlier status in imposing life without parole for felony murder, support a broader understanding of Article I, Section 13. Specifically, Appellant notes that, other than Florida, Pennsylvania incarcerates the highest number of individuals serving life without parole sentences. This, according to Appellant, is a result of Pennsylvania's status as one of only nine states and the federal government that mandates life without parole for felony murder. Appellant surveys the global status of life without parole sentences and points to the United Nations Human Rights Committee's November 2023 observations in which it requested that the United States "consider establishing a moratorium on the imposition of sentences of life imprisonment without parole." Concluding Observations on the Fifth Periodic Report of the United States of America, CCPR/USSA/CO/5, 12 (December 7, 2023), International Covenant on Civil and Political Rights, available at https://docs.un.org/en/CCPR/C/USA/CO/5. Appellant maintains that bringing the Commonwealth more in line with contemporary practices supports a broader interpretation of our Constitution's proscription against cruel punishments. Appellant also claims a racial disparity in application of the felony murder rule in Pennsylvania, and asserts that incarcerating elderly convicts for life wastes resources and does not further public safety. As a result, Appellant stresses that the substantial costs associated with

incarcerating the elderly, including expenditures for the specialized medical needs of an aging prison population, could be utilized for "programming that would improve public safety, such as rehabilitative, vocational, and educational programs as well as reentry and transition services."  Appellant's Brief at 40.

In light of these considerations, Appellant argues that our Commonwealth's cruel punishments clause should be interpreted to afford broader protections than the Eighth Amendment and requests that we adopt a proportionality standard which would prohibit punishments that are excessive in relation to their deterrence and rehabilitation effects. Applying such construct here, Appellant asserts that a life without parole sentence for a felony murder conviction is excessive in relation to deterrence or rehabilitation goals, and that his sentence constitutes cruel punishment for purposes of Article I, Section 13 of our Constitution, and so should be overturned.

Sixteen *amicus* briefs have been filed on behalf of Appellant.  While some echo Appellant's reasoning, certain *amici*, discussed below, provide additional insights as to the constitutionality of the punishment for felony murder.  Specifically, *Amicus* Governor Josh Shapiro offers that there are clear differences in the crimes of first degree murder and second degree murder, and they can involve a wide variety of culpable conduct; however, the punishment is largely the same.  Governor Shapiro maintains that while, in some instances, a second degree murderer may warrant a sentence of life without parole, it should not be mandated in all situations.  Governor Shapiro submits that imposing the same sentence for all first and second degree murders renders it unconstitutional under Article I, Section 13.  Moreover, according to Governor Shapiro, a judge should have discretion to impose a minimum sentence based upon the facts and circumstances of the case, within reasonable statutory limits, including the impact of the crime upon its victims. In the Governor's view, a sentence of mandatory life imprisonment without parole for

felony murder does not promote the purposes of punishment — deterrence and rehabilitation — and leads to the unnecessary housing of prisoners, placing financial strains on the Commonwealth. Finally, Governor Shapiro urges that our Court find the current punishment to be unconstitutional and leave to the legislature and executive branches how to implement a new constitutional rule, and asks that we refrain from determining the retroactive nature of its application.

The Pennsylvania Prison Society, American Civil Liberties Union of Pennsylvania, American Civil Liberties Union, the Roderick and Solange Macarthur Justice Center, and Professor Michael Meranze offer the rich history behind the adoption of Section 13, through which Pennsylvania led the country in the application of Enlightenment principles to penal systems, focusing on reformation and deterrence; as a result, they submit a mandatory sentence of life without parole for felony murder is manifestly cruel.

Former Department of Corrections Secretaries John Wetzel and George Little and Executives Transforming Probation and Parole offer policy reasons to find a life without parole sentence for felony murder to be unconstitutional: stressing the enormous, and in their view, unnecessary, cost of keeping individuals who are often persons convicted at a very young age and who are incarcerated for their entire lives, as well as inhibiting correctional leaders' ability to direct resources and invest in individuals who could benefit from rehabilitation efforts. *Amici* also remind the Court that making a class of individuals eligible for parole does not mandate that they would receive parole, as they would be subject to a public safety review.

Criminologists and Law Professors dissect the four purposes of sentencing: retribution, rehabilitation, deterrence, and incapacitation, and conclude that a life without parole sentence for felony murder is inconsistent with all four penological purposes. Likewise, Power Interfaith/Power Live Free note that life without parole sentences are

inconsistent with the values of redemption and rehabilitation, and assert that 73.3% of those convicted of felony murder in Pennsylvania were 25 years or younger when committing the offense; 80% of those convicted were people of color; and just under 70% were Black, despite that Black people comprise roughly 12% of the Commonwealth's population.

Special Rapporteur on Contemporary Forms of Racism and U.N. Expert Mechanism to Advance Racial Justice and Equality in Law Enforcement offer that Pennsylvania's use of life without parole sentences is out of step with most regions of the world, which rarely employ life sentences, even with parole; violates international human rights law; and disproportionately impacts "Black and Latinx" Pennsylvanians, in violation of international human rights treaties. The Antiracism and Community Lawyering Practicum at Boston University School of Law *et al.*, echo the significant racial disparities in the application of Pennsylvania's felony murder statute.

Family Members and Loved Ones of Victims Killed by Murder offer personal testimonies of individuals who lost family members and close friends to murder, who believe that the values of mercy and redemption require that those sentenced to life without parole for second degree murder be given an opportunity to make efforts to repair the harm that they caused and make positive contributions to society outside of prisons. Similarly, Avis Lee, *et al.*, offer the stories of individuals, formerly serving life without parole sentences, who aver that such a sentence is ineffective for achieving the penological purposes of rehabilitation and accountability. Related thereto, Former Judges and Prosecutors of Pennsylvania add that not only does a life sentence without parole alter the offender's life by a "forfeiture that is irrevocable," it also prevents judges and prosecutors from considering each individual's intent, prior criminal history, or lack thereof, personal background, and other factors that would be relevant in determining an

appropriate sentence. *Amici* Brief at 5. Philadelphia District Attorney's Office echoes these concerns, and argues that treating all offenders the same regardless of culpability results in citizens less likely to respect such laws as they are perceived as unjust and unfair.

In response, the Commonwealth takes the position that Article I, Section 13 offers no greater protections than afforded by the Eighth Amendment to the United States Constitution and contends that a life without parole sentence for a felony murder conviction does not violate either Constitution. Specifically, the Commonwealth first emphasizes that a statute will not be deemed to be unconstitutional unless it clearly, palpably, and plainly violates our organic charter; that all doubts are to be resolved in finding that the legislative enactment passes constitutional muster; and that a challenger to the constitutionality of a statute bears a very heavy burden.

The Commonwealth asserts that Appellant's argument that his sentence is disproportionate to his culpability is actually a challenge to his felony murder conviction and an attempt to escape the consequences of being an accomplice. The Commonwealth explains that when a killing occurs in the commission of a felony, all who participate therein are equally guilty of murder, citing *Yuknavich*, *supra*. Moreover, the Commonwealth stresses that, under the common law, felony murder imputes malice where it may not exist expressly and "the malice necessary to make a killing, even an accidental one, murder, is constructively inferred from the malice incident to the perpetration of the initial felony," quoting *Myers*, 261 A.2d at 553. Indeed, the Commonwealth points out that the legislature assigned a greater penalty for second degree murder when compared to third degree murder, even though the latter is malicious. This, according to the Commonwealth, is permissible, as the law seeks to provide a greater deterrent to engaging in particularly dangerous felonies, such as those

triggering the felony murder rule. In the Commonwealth's view, this defeats Appellant's argument that he is less culpable than his principals and deserving of a lesser sentence. The Commonwealth emphasizes that not only is it reasonable to charge an individual with the knowledge that the natural and probable consequences of engaging in certain felonies may well result in death or grievous bodily harm to those involved, but that it is for the General Assembly to define grades of murder and to assign sentences to them, including life without parole and death.

The Commonwealth refutes Appellant's analysis regarding the Pennsylvania Constitution and specifically his *Edmund*s analysis, beginning with our Court's decision in *Zettlemoyer*, which held that the rights secured by Pennsylvania's constitutional prohibition against "cruel punishments" are co-extensive with those secured by the Eighth and Fourteenth Amendments to the United States Constitution. As to the constitutional text, the Commonwealth challenges Appellant's conclusion that the Eighth Amendment does not apply to punishments that have been continuously applied, whereas the Pennsylvania Constitution does, as the Commonwealth submits that, in various United States Supreme Court decisions, the defendants were challenging punishments that had been continuously used for years, and the high Court found them to be violative of the Eighth Amendment, citing *Graham* and *Enmund*. As to a historical analysis, the Commonwealth acknowledges that while Pennsylvania was progressive regarding punishment, as exemplified by the legislature's limitation on capital punishment solely for first degree murder in 1794, it contends that this merely demonstrates such changes are for the "political will of the people acting through their elected legislators," and, thus, fails to support a finding that our Constitution intended greater protections than the federal counterpart. Commonwealth's Brief at 20-21.

As to other states' case law, the Commonwealth offers that, while other states have provided greater protections than the federal Constitution, they have done so in their treatment of juveniles sentenced to life without parole, and none address adults convicted of felony murder. The Commonwealth highlights that, while certain states have eschewed automatic sentences of life without parole for adults, these changes have been affected through legislative enactments, citing legislation in California, Cal. Penal Code Ann. § 188-89; Colorado, Colo. Rev. Stat. Ann. § 18-1.3-401; and Minnesota, Minn. Stat. Ann. § 609.05. Finally, as to policy concerns, the Commonwealth contests Appellant's assertion that Pennsylvania is an outlier regarding the number of individuals serving life without parole as a function of our sentencing scheme for murder generally, and proffers that, of the 5,375 persons serving life without parole, 1,063 were serving sentences for second degree murder, and that Appellant fails to account for how many of these individuals were "non-slayers," the class which Appellant is attempting to demonstrate is disproportionately punished. Commonwealth's Brief at 25. The Commonwealth also maintains that incarceration costs are for the legislative and executive branches to determine. Finally, the Commonwealth emphasizes that life without parole is subject to the Governor's power to commute of a life sentence to a term of years, which places that individual within the jurisdiction of the Parole Board. Indeed, the Commonwealth notes that, while the practice was curtailed for a certain period beginning with Governor Richard Thornburgh, such commutations were significantly increased under Governor Tom Wolf, with 101 hearings held in September of 2015 resulting in 53 commutations. Moreover, while a 1997 amendment to our Constitution required a unanimous Parole Board to recommend a commutation of a life sentence, this, according to the Commonwealth, reflected the will of the people and could be undone if the citizens so desired. Thus, the Commonwealth

submits that our Court should reject the suggestion that Article I, Section 13 offers any greater protection than the Eighth Amendment to the United States Constitution.

Pennsylvania District Attorneys Association has filed an *amicus* brief on behalf of the Commonwealth. Like the Commonwealth, *Amicus* challenges Appellant's argument as an attack on who is subjected to a conviction of second degree murder, rather than to the sentence itself. Specifically, *Amicus* proffers that Appellant has merely presumed, rather than proven, that any second degree murderer convicted of a crime through vicarious liability did not kill or intend to kill, *i.e.*, has a *per se* constitutionally significant diminished culpability. Indeed, *Amicus* points out that the Crimes Code provides that an accomplice to an enumerated felony that results in death is equally responsible as the principal; thus, the malice or intent to commit the underlying crime is imputed to the killing to make it a second degree murder, regardless of whether the defendant intended to physically harm the victim. This, according to *Amicus*, is where Appellant's argument falls short, as he has not established the unconstitutionality of the statute by providing that there is a constitutional significance to the difference between being the killer and being a killer through vicarious liability. *Amicus* warns that finding the statute to be unconstitutional would make constitutionally suspect the entire doctrine of vicarious criminal liability, as it relates to any crime and not simply felony murder. *Amicus* emphasizes that some second degree murderers are more culpable than first degree murderers as they killed, but first raped, robbed, kidnapped, or committed arson. *Amicus* also points out that Appellant's related argument that his sentence was disproportionate rests on the same faulty foundation that there is a constitutionally valid distinction between being a killer through one's own act and through criminal vicarious liability, and urges for redress through the legislature and not through the courts. *Amicus* also takes issue with

numerous *amicus* briefs filed in support of Appellant, which offer policy considerations regarding the felony murder rule, but which *Amicus* contends are solely for the legislature.

The Office of the Attorney General has also filed an *amicus* brief in support of the Commonwealth, advocating for change in the felony murder statute, but stressing that such change is for the legislature.[11]  According to *Amicus*, nothing in the history of the "cruel punishments" clause suggests an intent to bar the punishment of life without parole for felony murder, and, rather, that the passing of legislation immediately after the adoption of the clause punishing felony murder by death suggests the opposite. Contesting Appellant's claim that Pennsylvania is an outlier, *Amicus* offers numerous states which mandate life without parole for at least certain individuals who commit felony murder.  *Amicus* also warns that any consideration of the culpability of a defendant will be treated as an element of the offense, requiring findings by a jury proven beyond a reasonable doubt.  Finally, *Amicus* argues that, while there may be compelling policy arguments in favor of statutory reform, such policies alone cannot render a punishment unconstitutional, and such reforms based upon policies are properly for the legislative and executive branches who have the power and resources to craft a just and fair punishment for the crime of felony murder.

### B. *Edmunds* Analysis

The movement beginning in the 1970s of renewed interest in the rights bestowed to citizens under their state charters is commonly called the "New Judicial Federalism."[12]

---

[11] The Office of the Attorney General's motion for leave to file a supplemental Amicus Brief is granted.

[12] *See* William J. Brennan Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489 (1977); Robert J. Smith *et al.*, *State Constitutionalism and the Crisis of Excessive Punishment*, 108 Iowa L. Rev. 537, 568–69 (2023) ("There is a recently reinvigorated dialogue among jurists and scholars aimed at restoring the primacy of state constitutions and state courts in enforcing individual rights.  This dialogue, which focuses on 'whether state forums might yield the greatest or optimal level of rights protection, at (continued…)

In *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), our Court set forth the now-familiar framework for undertaking an independent analysis of the rights bestowed upon our citizens by our Commonwealth's Constitution, in contrast to those granted under the United States Constitution. Per *Edmunds*, litigants and courts must, in contrast to the relevant federal constitutional provision, review (1) the text of the Pennsylvania Constitutional provision; (2) the history of the provision, including Pennsylvania case law; (3) related case law from other states; and (4) policy considerations, including issues of state and local concern and their applicability in modern Pennsylvania jurisprudence. *Id*. at 895. Based on these factors, we address whether Pennsylvania's Constitution provides rights beyond the minimum floor established by the United States Constitution. *Id*, at 894.

### 1. Text

Following our *Edmunds* protocol, we begin by examining the language of the coordinate federal and state constitutional provisions. As noted, the Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Article 1, Section 13 states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted." Pa. Const. art. I, § 13.

Thus, on its face, Article I, Section 13, which forbids "cruel punishments," is distinct from its federal counterpart. Moreover, Section 13 seemingly offers broader protection than the Eighth Amendment's ban on the imposition of "cruel *and unusual* punishments."

---

least on some issues,' is accompanied by a recent and modest uptick in state courts interpreting their constitutional provisions more broadly than related federal provisions spanning topics from takings clause cases to marriage equality to searches and seizures to enforcing voting rights." (internal citations omitted)).

.

However, certain prior case law suggests that this clear textual distinction is of no moment. *See Commonwealth v. Batts*, 66 A.3d 286, 298 (Pa. 2013) ("*Batts I*") (in declining to give meaning to the textual difference of "cruel" versus "cruel and unusual," the Court explained that "[w]e find the textual analysis provided by Appellant and his *amici* to carry little force. The purport of the argument is that this Court should expand upon the United States Supreme Court's proportionality approach, not that it should derive new theoretical distinctions based on differences between the conceptions of 'cruel' and 'unusual'"); *Commonwealth v. Means*, 773 A.2d 143, 151 (Pa. 2001) (plurality) ("A comparison of the text does not advance a basis for distinct treatment under either document."); *Zettlemoyer*, *infra* (determining that Section 13's cruel punishments provision was co-extensive with the Eighth Amendment); *cf. Trop v. Dulles,* 356 U.S. 86, 100 n.32, (1958) (plurality) (suggesting that most of the judicial decisions have treated "cruel and unusual" as, essentially, an amalgam)).

Yet, when read closely, we find a basis for a substantive distinction between the two constitutional provisions. One basis for a distinct approach comes from a fuller exploration of the meaning of the terms "cruel" and "unusual." Recently, the United States Supreme Court, in *City of Grants Pass, Oregon v. Johnson*, traced the history of the Eighth Amendment and clarified that "[p]unishments . . . were 'cruel' because they were calculated to 'superad[dition]'of 'terror, pain, or disgrace.' . . . And they were 'unusual' because, by the time of the Amendment's adoption, they had 'long fallen out of use.'" 603 U.S. 520, 542 (2024) (citations omitted); *see also Graham*, 560 U.S. at 62-67 (finding life without parole for nonhomicide offenses committed by juveniles "exceedingly rare," that is, "unusual"); *Kennedy*, 554 U.S. at 422-26 (determining a death sentence for the rape of a child was not permitted in 45 states, and, thus, evidence of a "national consensus" against the sentence); *Harmelin*, 501 U.S. at 967 (noting difference between "cruel" and

"unusual" punishments in the federal charter and offering that "a disproportionate punishment can perhaps always be considered 'cruel,' but it will not always be (as the text also requires) 'unusual'"); John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 N.W. U. L. Rev. 1739, 1745 (2008) ("As used in the Eighth Amendment, the word 'unusual' was a term of art that referred to government practices that are contrary to 'long usage' or 'immemorial usage.'"). This analysis strongly suggests that the term "unusual" has an independent meaning and substantive import regarding the Eighth Amendment and supports an understanding that the cruel punishments provision in the Pennsylvania Constitution, which does not use the term "unusual," has a distinct meaning and application.

It follows that the omission of the term "unusual" from Article I, Section 13 of the Pennsylvania Constitution excludes the requirement that a challenged sentence be contrary to long-standing practice or contrary to the common law. This pronounced limit found in the Eighth Amendment is meaningful and substantive, supporting a finding that our Constitution provides broader protections than its federal counterpart. *Accord People v. Bullock,* 485 N.W.2d 866, 872 n.11 (Mich. 1992) (considering Michigan's Constitution which prohibits "cruel or unusual" punishment, Mich. Const. art. I, § 16, and offering that "[t]he set of punishments which are *either* 'cruel' *or* 'unusual' would seem necessarily broader than the set of punishments which are *both* 'cruel' *and* 'unusual'" (emphasis original)).

### 2. History

The history of Article I, Section 13, the original meaning of that provision, as well as the framers' intent regarding the adoption of the Eighth Amendment, provide additional insights into whether Section 13 grants greater safeguards to our citizens than set forth in the federal Constitution.

In considering the history of the Eighth Amendment, the United States Supreme Court has explained that the framers looked to English history as a source. Specifically, over 30 years ago, Justice Antonin Scalia penned a concurring opinion in *Harmelin*, reasoning that the original meaning of the Eighth Amendment could be traced back to England's 1689 Declaration of Rights, which prohibited "cruell and unusuall Punishments." *Harmelin*, 501 U.S. at 967-68 (Scalia, J. concurring). The requirement that a punishment not be "unusuall" was "primarily a requirement that judges pronouncing sentence remain within the bounds of common-law tradition," *id*. at 973-74; that is, that sentences be "regularly or customarily employed," *id*. at 976. Almost 20 years later, the high Court explained that the English approach embraced retribution as a justification for punishment and that the Eighth Amendment originally sought to prohibit only methods of punishment armed with a "(cruel) 'superadd[ition]' of 'terror, pain, or disgrace.'" *Bucklew*, 587 U.S. at 133 (quoting *Baze v. Rees*, 553 U.S. 35, 48 (2008)).[13] More specifically, as Justice Neil Gorsuch, writing for the Court, explained in *Bucklew*:

> Methods of execution like [dragging the prisoner to the place of execution, disemboweling, quartering, public dissection, and burning alive] readily qualified as "cruel and unusual," as a reader at the time of the Eighth Amendment's adoption would have understood those words. They were undoubtedly "cruel," a term often defined to mean "[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting," 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773), or

---

[13] *See Harmelin*, 501 U.S. at 959 (Kennedy, J., joined by O'Connor and Souter, JJ.) (recognizing a variety of legitimate penological goals based on theories of retribution, deterrence, incapacitation, and rehabilitation, but holding that the Eighth Amendment did not mandate adoption of any one such scheme); *Graham*, 560 U.S. at 71 ("Retribution is a legitimate reason to punish, but it cannot support the sentence at issue here. Society is entitled to impose severe sanctions on a juvenile nonhomicide offender to express its condemnation of the crime and to seek restoration of the moral imbalance caused by the offense. But '[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.'").

"[d]isposed to give pain to others, in body or mind; willing or pleased to torment, vex or afflict; inhuman; destitute of pity, compassion or kindness," 1 N. Webster, An American Dictionary of the English Language (1828). And by the time of the founding, these methods had long fallen out of use and so had become "unusual." 4 Blackstone, *supra,* at 370; Banner 76; *Baze*, 553 U.S. at 97, 128 S.Ct. 1520 (THOMAS, J., concurring in judgment); see also Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1770-1771, 1814 (2008) (observing that Americans in the late 18th and early 19th centuries described as "unusual" governmental actions that had "fall[en] completely out of usage for a long period of time").

*Bucklew*, 587 U.S. at 130-31. Consistent therewith, Justice Gorsuch, again writing for the high Court in *City of Grants Pass, Oregon v. Johnson*, stressed the framers' intent to prohibit certain savage punishments that were no longer employed, adding:

We have previously discussed the Clause's origins and meaning. In the 18th century, English law still "formally tolerated" certain barbaric punishments like "disemboweling, quartering, public dissection, and burning alive," even though those practices had by then "fallen into disuse." *Bucklew v. Precythe*, 587 U.S. 119, 130, 139 S.Ct. 1112, 203 L.Ed.2d 521 (2019) (citing 4 W. Blackstone, Commentaries on the Laws of England 370 (1769) (Blackstone)). The Cruel and Unusual Punishments Clause was adopted to ensure that the new Nation would never resort to any of those punishments or others like them. Punishments like those were "cruel" because they were calculated to " 'superad[d]' " " 'terror, pain, or disgrace.' " 587 U.S., at 130, 139 S.Ct. 1112 (quoting 4 Blackstone 370). And they were "unusual" because, by the time of the Amendment's adoption, they had "long fallen out of use." 587 U.S., at 130, 139 S.Ct. 1112. Perhaps some of those who framed our Constitution thought, as Justice Story did, that a guarantee against those kinds of "atrocious" punishments would prove "unnecessary" because no "free government" would ever employ anything like them. 3 J. Story, Commentaries on the Constitution of the United States § 1896, p. 750 (1833). But in adopting the Eighth Amendment, the framers took no chances.

*Johnson*, 603 U.S. at 542. Thus, the Eighth Amendment proscribed only methods of punishment inflicting the superaddition of pain beyond death, and permitted those punishments which had not fallen out of use as they were not unusual.

Whereas the United States Supreme Court found that the original understanding of the Eighth Amendment deemed only barbaric *and* long-disused punishments to be unconstitutional, this may be contrasted with Pennsylvania's framers' understanding of Section 13. The Pennsylvania constitutional provision forbidding "cruel punishments" was adopted in 1790, and has remained unchanged in all subsequent amendments to our charter. Constitution of 1790, art. IX, § 13. Critically, and to highlight important context, the "cruel punishments" clause was ratified one year before the Eighth Amendment was adopted. Thus, the meaning of the Pennsylvania provision was not intended to mirror the Eighth Amendment, rather, it was the Pennsylvania Constitution which served as the predecessor to the federal Constitution, and whose authors chose to veer from the Pennsylvania Constitution in fashioning the Eighth Amendment.

The original Pennsylvania Constitution of 1776 failed to contain any reference to cruel punishments. Noted Pennsylvania constitutional scholars suggested that the reason for the omission was unknown. *See* Bruce Ledewitz, *Bail, Fines and Punishments*, The Pennsylvania Constitution, A Treatise on Rights and Liberties, (Gormley ed. 2004) § 16.1, p. 518. This was curious, as, at this time, Pennsylvania largely based its Declaration of Rights on the Virginia Declaration of Rights which contained a prohibition on "cruel and unusual punishments." *Id*. Similarly, there was no clear explanation why, in 1790, when certain Declaration of Rights provisions were amended, the "cruel punishments" language was added without any reference to "unusual" punishments, as found in the Virginia charter. *Id*.

In recent groundbreaking scholarship, however, Kevin Bendesky, in his article *"The Key-Stone to the Arch": Unlocking Section 13's Original Meaning*, 26 U. Pa. J. Const. L. 201 (2023), offers an explanation. Early reforms in punishment began at the time of the Revolution and continued through the adoption of Pennsylvania's first constitution. Indeed, Pennsylvania led the country in penal reform. These reforms manifested themselves in Article I, Section 13, which, despite numerous amendments to the Constitution, has remained unchanged.

As explained above, the federal drafters, based upon England's 17th century Declaration of Rights, barred punishments which were cruel, and which were not regularly or customarily imposed. Thus, the framers were not necessarily concerned with the severity of a punishment in and of itself, for, to be prohibited, the punishment had to also be unusual, *i.e.*, long disused. By contrast, Pennsylvania's founding fathers and constitutional framers exhibited a particular sensitivity to one's culpability from the earliest days of the Colonies.

Our Commonwealth's founder William Penn recoiled from English penal codes and, relying upon long-standing Quaker ideals, embraced a "distinctly Pennsylvanian" view of punishment, forged by his and his followers' experience after fleeing persecution in England, and which resulted in the enactment of his own code of criminal law. *Id*. at 236. Later, the Pennsylvania drafters of our Constitution, who eschewed a requirement of unusualness, "perceive[d] . . . that the severity of the criminal law" they inherited from England was "an exotic plant and not the native growth of Pennsylvania," *id*. at 213 (quoting William Bradford, *An Enquiry How Far the Punishment of Death is Necessary in Pennsylvania* 20 (T. Dobson, 1793) ("Bradford")) — and so rejected "[c]ruel and sanguinary punishments," especially those rooted within the common law tradition. *Id*. (quoting Jared Ingersoll, *Report: Made by Jared Ingersoll. Esq. Attorney General of Pa.,*

*in compliance with a resolution of the legislature, passed the 3d of Mar., 1812, relative to the penal code. Communicated to the legislature, Jan. 21, 1813*, 1 J. of Juris: A New Series of The Am. L.J. 1, 325 (John E. Hall ed. 1821) (footnotes omitted) ("Ingersoll")). Thus, Pennsylvania's founding fathers repudiated the severity of English criminal laws and de-emphasized retribution as a justification, which had served as the basis of the Eighth Amendment, and instead looked to emerging Enlightenment theories as a foundation for criminal punishment in Pennsylvania. *Id*.

These Enlightenment principles, expressed by the French philosopher Baron de Montesquieu and Italian criminologist Cesare Beccaria, shaped penological thought in Pennsylvania both before and after the Revolution. These pioneers in punishment reform eschewed the importance of the severity of a punishment, which in Montesquieu's mind led to savagery and resulted in reluctant accusers and jury acquittals, and undercut the point of punishment: prevention. *Id*. at 215-16. Similarly, Beccaria's philosophy was based upon the social-contract theory, in which punishment was necessary to defend the public from "the usurpations of individuals," and, as criminal activities harmed society, and not individual citizens, the reason for punishment was to "deter these societally harmful usurpations." *Id*. at 217 (quoting Cesare Beccaria, On Crimes and Punishments (1764), *reprinted in* On Crimes and Punishments and Other Writings (Richard Bellamy ed., Richard Davies, Virginia Cox & Richard Bellamy trans., Cambridge Univ. Press, 1995)). Indeed, quoting "the great Montesquieu," Beccaria found that "[e]very punishment which is not derived from absolute necessity is tyrannous." *Id*. This foundational emphasis upon necessity informed the understanding of cruelty, and as the primary purpose of punishment was deterrence, in their view, permissible punishment was ideally the most lenient means that deterred. *Id*. at 218.

Thus, according to Bendesky, in contrast to the English common law, and based upon Enlightenment philosophy, the Pennsylvania framers advocated that only deterrence and reformation justified a punishment. As a result, the framers rejected a requirement that punishment also be unusual given their foundational belief that "anything *unnecessary* for achieving the limited purposes of punishment *was* the *superaddition* of cruelty." *Id*. at 212 (emphasis original).

This emphasis on deterrence and reformation, however, was tempered by other justifications for punishment. Although not direct evidence of the framer's intent, but nonetheless persuasive evidence of the distinct constitutional meaning of the Pennsylvania constitution compared with the federal Constitution,[14] following the ratification of the Constitution's "cruel punishments" clause, the nascent Pennsylvania legislature adopted a further reform in 1794: the first penal code passed after the new constitution limited the death penalty to first degree murder and divided murder into degrees — the first state to do so. The law's preamble confirms that Pennsylvanians strongly believed in notions of reform and providing for public safety as a basis for rejecting severe and excessive punishment, but also embraced additional justifications for punishment such as incapacitation and retribution:

> Whereas the design of punishment is to prevent the commission of crimes, and to repair the injury that hath been done thereby to society or the individual, and it hath been found by experience, that these objects are better obtained by moderate but certain penalties, than by severe and excessive punishments: And where as it is the duty of every government to endeavor to reform, rather than exterminate offenders, and the punishment of death ought never to be inflicted, where it is not absolutely necessary to the public safety.

---

[14] *Harmelin*, 501 U.S. at 980.

*Id.* at 214-15 (quoting Act of 22nd Apr. 1794, *reprinted in* John W. Purdon, Digest of the Laws of Pennsylvania 9 (M'Carty & Davis, 1831) at 646-47). Thus, there was a strong sentiment favoring Enlightenment principles,[15] and it is clear that the framers of the Pennsylvania Constitution offered significantly different notions of what constitutes cruelty in punishment, as compared to the federal Constitution.

---

[15] As forcefully emphasized by Thomas Mifflin, the Commonwealth's first Governor and chairman of the 1790 Constitutional Convention, "every punishment, which is not absolutely necessary for [deterrence], is an act of tyranny and cruelty." *Id.* at 215 (quoting S. Journal, 17th Assemb. 14 (Pa. 1792)). This and related sentiments were echoed by other architects of Pennsylvania's embryonic government who believed that only deterrence and reformation justified the infliction of punishment and who accepted that notions of necessity, and, thus, cruelty, evolved over time with the development of "moral and empirical understanding." *Id.* at 219. These luminaries included, among others, William Bradford, Supreme Court Justice, Attorney General, 1790 Constitutional Convention attendee, and father of the reformation of the penal code of Pennsylvania, who believed in two "principles ... so important that they deserve a place among the *fundamental* laws of every free country:" one, that "*[t]he prevention of crimes is the soel end of punishments*;" and two, that "*every punishment which is not absolutely necessary for that purpose is a cruel and tyrannical act.*" *Id* at 221 (emphasis original) (citing Bradford, at 3, 4). Likewise, James Wilson, a signor of the Declaration of Independence and the United States Constitution, and regarded as the father of the Pennsylvania Constitution, believed that, "[i]n a free state, the law should impose no restraint upon the will of the citizen, but such as will be productive of advantage, publick or private, sufficient to overbalance the disadvantages of the restraint." *Id.* at 224 (quoting 3 James Wilson, Lectures on Law (1790), *reprinted in* The Works of the Honourable James Wilson 442-443 (Bird Wilson ed., 1804)). Similarly, both Thomas McKean – signatory to the Declaration of Independence, a member of the Pennsylvania Convention that ratified the federal Constitution, chair of the 1790 Pennsylvania Constitutional Convention, and the Commonwealth's first Chief Justice – as well as George Clymer – signor of both the Declaration of Independence and the United States Constitution – rejected retribution as a justification for punishment and were opposed to punishments of unnecessary severity. *Id.* at 227. Finally, Jared Ingersoll, esteemed lawyer and Attorney General from 1790 to 1799, who authored an influential and authoritative report consolidating the penal code which was relied upon by the Governor, the General Assembly, and the Pennsylvania Supreme Court, in discussing the purposes underlying punishment reasoned that "a less severe and awful penalty can effect the same purposes, or, in other words, if it be not *necessary* to punish murder with death, a milder medium of correction should be chosen." *Id.* at 229 (citing Ingersoll at 330) (emphasis original).

For these reasons, we find that the United States Supreme Court's historical analysis of the intent of the Eighth Amendment, emphasizing retribution as a justification for punishment and limiting its protections to punishments which have fallen out of use, is at variance with the historical origins of Article I, Section 13. Section 13 is founded to a large degree upon Enlightenment theories of deterrence and reformation, and on a rejection of punishments extending beyond the penological justifications for punishment as unnecessary, which constituted the *superaddition* of cruelty. Moreover, this notion of necessity – and, thus, cruelty – was understood to evolve over time with the development of moral and scientific advancements. We find that this history, for purposes of our *Edmunds* analysis, reveals a distinct background for the two constitutional provisions, supporting an interpretation of Section 13 which provides greater protections for Pennsylvania citizens against cruel punishment.

### 3. Pennsylvania Case Law

While the rich history underlying Pennsylvania's "cruel punishments" clause suggests a distinct meaning for the provision, our Court's case law, dating back to 1982, has suggested that the protections offered by the two constitutions are co-extensive. We find that this understanding of the two constitutional provisions was a result of an incomplete historical analysis, and one which has evolved as expressed in our Court's more recent decisions.

The first independent consideration of the cruel punishments provision was undertaken by our Court over 40 years ago in *Commonwealth v. Zettlemoyer*, wherein we held that the death penalty did not violate Article I, Section 13 of the Pennsylvania Constitution. *Zettlemoyer*, 454 A.2d 937 (Pa. 1982).

The *Zettlemoyer* Court rejected numerous claims under the federal Constitution, including that the imposition of the death penalty violated the Eighth Amendment to the

United States Constitution because the statutory provisions for appellate review were inadequate to ensure that the jury's discretion was channeled so as to avoid the arbitrary and capricious imposition of the death penalty. *Id*. at 960-64. The Court relied to a large degree upon the United States Supreme Court's decision in *Gregg v. Georgia,* 428 U.S. 153 (1976) (plurality), finding our sentencing scheme to more closely resemble Georgia's scheme, which had survived constitutional challenge. *Id*. at 966.

Our Court then rejected Zettlemoyer's claim that the imposition of the death penalty violated Article I, Section 13 of the Pennsylvania Constitution. In doing so, we looked to the framers' understanding of the propriety of the death penalty and concluded that the framers of the two Constitutions did not consider the death penalty to be a *per se* violation of either Constitution. More specifically, our Court reasoned that the intention of the framers was not dispositive, and the prohibitions against "cruel" or "cruel and unusual" punishments was not a "static concept;" rather, those constitutional provisions drew their meaning from "evolving standards of decency that mark the progress of a maturing society.'" *Id*. at 967-68. In discerning those "evolving standards of decency," the Court found that "the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards," and that "legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Id*. at 960 (quoting *Gregg,* 428 U.S. at 175-76, *quoting Furman,* 408 U.S. at 383).

That being the case, and again focusing on the propriety of the death penalty, our Court concluded that the General Assembly, since its origins, expressed its view that capital punishment, for at least some intentional killings, was an appropriate and necessary form of punishment, even in light of William Penn's "humane laws" of 1682 and 1683, which prescribed penalties less than death for all offenses *except* willful or

premeditated murder; indeed, we noted that, upon Penn's death in 1710, the Provincial Assembly repealed these laws and prescribed the death penalty for, *inter alia,* sodomy, buggery, rape, highway robbery, witchcraft and enchantment. *Id*. at 968. The Court explained that, thereafter, Pennsylvania has always operated with the penalty for at least some first degree murders. Finally, the *Zettlemoyer* Court pointed out that over a majority of the states reinstituted capital punishment for some crimes after the death penalty was declared unconstitutional in *Furman*. Thus, our Court concluded that, because the death penalty had been an accepted practice since the founding of the Commonwealth, it could not be considered to be "cruel punishment" for purposes of Section 13, and held that "the rights secured by the Pennsylvania prohibition against 'cruel punishments' are co-extensive with those secured by the Eighth and Fourteenth Amendments." *Id.* at 967.

Our decision in *Zettlemoyer*, however, had limitations. Our decision predated *Edmunds* by almost 10 years. Moreover, while the *Zettlemoyer* Court looked to the historical underpinnings of the cruel punishments clause, its focus was specifically on whether the death penalty existed at the time of the Pennsylvania Constitution's creation, rather than the framers' intent regarding the meaning of that provision vis-à-vis its federal counterpart.

Subsequent decisions construing Section 13 largely followed *Zettlemoyer*, either because the litigant did not raise an independent state constitutional analysis or did not develop such a claim. *See, e.g., Commonwealth v. Hairston*, 249 A.3d 1046, 1058 (Pa. 2021) (finding that defendant failed to present any compelling justification for altering the co-extensive holding of *Zettlemoyer*). However, our Court expressed the view that some claims could merit an approach under Article I, Section 13 distinct from the Eighth Amendment. Indeed, in *Means,* the question was whether a statute allowing victim impact evidence at the penalty phase of capital trials violated either the Eighth Amendment or

Article I, Section 13 of the Pennsylvania Constitution. The Opinion Announcing the Judgment of the Court did not accept that Article I, Section 13 claims required lockstep devotion to federal law interpreting the Eighth Amendment, as the Court could have refrained from further state constitutional analysis by citing *Payne v. Tennessee,* 501 U.S. 808 (1991), as dispositive of the Eighth Amendment claim. The Court nevertheless analyzed the question under Article I, Section 13, pursuant to *Edmunds,* ultimately concluding that the legislation was not constitutionally infirm. *Means,* 773 A.2d at 149-58.

Similarly, in *Batts I, supra*, notwithstanding the fact that the argument was developed primarily in terms of the Eighth Amendment and that Batts had not provided a fully developed *Edmunds* analysis, then-Justice Thomas Saylor, writing for a unanimous Court, explained that our Court's prior holdings that Section 13 was co-extensive with the Eighth Amendment arose only in discrete contexts, and, while rejecting a Section 13 claim in that appeal, offered that textual differences between the two Constitutions could provide a basis for greater protections under the Pennsylvania Constitution if our Court could derive new theoretical distinctions based upon the differences between the meaning of "cruel" and "unusual." 66 A.3d at 298.

The possibility of Section 13 providing greater protections than its federal counterpart was perhaps best explained by Chief Justice Ronald Castille in his concurring opinion in our subsequent decision in *Commonwealth v. Baker*, 78 A.3d 1044, 1053-54 (Pa. 2013) (Castille, C.J., concurring, joined by Saylor and Todd, JJ.). The majority in *Baker* analyzed the constitutional challenge only under the Eighth Amendment; however, Chief Justice Castille spoke to our Constitution. In his view, *Zettlemoyer* did not purport to establish that all claims arising under Article I, Section 13 should be treated as if they were subject to the same standards that would govern an equivalent Eighth Amendment

claim, in part because *Zettlemoyer* did not address a legislative enactment, but a judicial opinion deciding a specific issue, which was posed in *per se* fashion ─ specifically, whether capital punishment was unconstitutionally cruel under Article I, Section 13. As characterized by Chief Justice Castille, such a claim was doomed, as the death penalty had a long history, and the General Assembly had specifically and recently reapproved the punishment. Thus, he concluded that claims of cruel punishment could warrant a separate analysis under the two Constitutions, and could yield different results in the same factual scenario.

Moreover, the *Zettlemoyer* Court recognized that history is crucial to understanding Section 13, but it offered an incomplete account of the Commonwealth's constitutional past. It essentially reasoned that, because Pennsylvania law had originally tolerated the death penalty, the punishment could not become "cruel" now. But this approach to constitutional history ignored the original meaning of the provision and focused upon legislative actions in a vacuum, disregarding what the provision meant. Of course, *Zettlemoyer* predated *Edmunds* and, at that time, we did not emphasize the history of a constitutional provision. Furthermore, focusing on how our colonial forebearers viewed the death penalty overlooked the history of our prohibition on cruel punishments, and failed to allow for an independent meaning of Pennsylvania's prohibition on cruel punishment as explained in *Batts I* and *Baker*.

Based upon the above, we find that there is a unique Pennsylvania history to our "cruel" punishments provision that suggests that Section 13 provides greater protection to our citizens than its federal counterpart. Furthermore, as we find that our decision in *Zettlemoyer* was rendered prior to our seminal decision in *Edmunds*, and failed to engage in the rigorous assessment that we now believe necessary to determine rights under our Constitution, we conclude it serves as no impediment to the recognition of greater

protections under Section 13 when considered in light of our Court's recent case law, as set forth in *Batts I* and *Baker*.

### 4. Related Case Law From Other States

Consistent with *Edmunds*, we next consider related case law from other states. Virtually every state's constitution contains a provision analogous to the Eighth Amendment. Some states provisions are identical, barring "cruel and unusual punishments," others prohibit "cruel *or* unusual punishments," and five states in addition to Pennsylvania bar merely "cruel punishments." Case law from these five states ─ Delaware, Kentucky, Rhode Island, South Dakota, and Washington ─ offer varied interpretations.

Specifically, Delaware, Kentucky, and Rhode Island currently view their state constitutional protections as co-extensive with Eighth Amendment protections; however, it appears these states have not engaged in a rigorous *Edmunds*-like analysis in reaching their conclusions. Specifically, the Supreme Court of Delaware, in its 1963 decision in *State v. Cannon*, 190 A.2d 514, 515 (Del. 1963), explained that, even though Delaware's 1776 Declaration of Rights barred "cruel or unusual punishments" and the 1792 Constitution omitted the phrase "or unusual," nevertheless, "the omission of the phrase 'or unusual' has little or no significance." *Id*. This interpretation was recently reaffirmed by the Superior Court of Delaware in *State v. Desmond*, No. 91009844DI, 2024 WL 3456225, at *5-6 (Del. Super. Ct. July 16, 2024). Similarly, Kentucky has interpreted its constitution to be co-extensive with the Eighth Amendment. *See Riley v. Commonwealth*, 120 S.W.3d 622, 633 (Ky. 2003) (determining that Section 17 of the Kentucky Constitution was identical to the Eighth Amendment, "except that it proscribes 'cruel punishment' instead of 'cruel and unusual punishments,'" but regarding such "variation in phraseology as a distinction without a difference"); *Turpin v. Commonwealth*, 350 S.W.3d 444, 448

(Ky. 2011) (finding Section 17 provided protections parallel to those accorded by the Eighth Amendment). Rhode Island has likewise held that "the Eighth Amendment's prohibition against cruel and unusual punishment and the provisions of article 1, section 8, of the Rhode Island Constitution are identical." *State v. Monteiro*, 924 A.2d 784, 795 (R.I. 2007).

By contrast, the Supreme Court of South Dakota has explained that the South Dakota Constitution may provide greater protections against cruel punishments than the federal constitution. *State v. Moeller*, 548 N.W.2d 465, 487 (S.D. 1996) (in rejecting challenge to the death penalty as cruel punishment, court explained that its constitution could be interpreted to provide an individual with greater protection than the federal constitution).

The Washington Supreme Court, however, has set forth the most extensive analysis of its state's constitutional prohibition on cruel punishments. Specifically, in *State v. Bassett*, 428 P.3d 343 (Wash. 2018), the Washington Supreme Court held that sentencing a juvenile to life without parole, even after individualized sentencing, violated Article I, Section 14 of Washington's state constitution — the provision which bans cruel punishments. In doing so, the *Bassett* court reasoned that its constitutional provision provided greater protection than the Eighth Amendment "because it prohibits conduct that is merely cruel; it does not require that the conduct be both cruel and unusual." *Id*. at 349.

Similarly, addressing its constitution's "cruel *or* unusual" provision, in *State v. Kelliher*, 873 S.E.2d 366, 385 (N.C. 2022) (emphasis original), the Supreme Court of North Carolina held its clause offered protections that were distinct from, and broader than, the federal provision, and determined that sentencing a juvenile to more than 40 years in prison before becoming eligible for parole constituted a *de facto* sentence of life

without parole, and was unconstitutional, *id*. at 390-95. Likewise, in *People v. Bullock*, 485 N.W.2d 866 (Mich. 1992), the Michigan Supreme Court held that the imposition of a life sentence for possession of 650 or more grams of cocaine violated the Michigan Constitution's prohibition against "cruel or unusual" punishments, despite the United States Supreme Court having previously held that such a sentence did not violate the Eighth Amendment. As the court explained, "the Michigan provision prohibits 'cruel *or* unusual' punishments, while the Eighth Amendment bars only punishments that are both 'cruel *and* unusual.' This textual difference does not appear to be accidental or inadvertent." *Id*. at 872 (emphasis original); *see also People v. Taylor*, 2025 WL 1085247, *6 (Mich. Apr. 10, 2025) (holding that mandatorily condemning offenders who were 19 or 20 years old when they committed their crimes to die in prison, without first considering the attributes of youth that late adolescents and juveniles share, no longer comports with the "evolving standards of decency that mark the progress of a maturing society," and that the state constitution did not permit the imposition of such punishment against this class of late adolescents without individualized sentencing). Indeed, California, Florida, and Minnesota courts have also described the same textual difference between the Eighth Amendment and their own constitutional provisions (barring "cruel or unusual" punishments) as meaningful. In *People v. Carmony*, 26 Cal. Rptr. 3d 365, 378 (Cal. Ct. App. 2005), a California Court of Appeals referred to it as "purposeful and substantive rather than merely semantic." The Florida Supreme Court, in *Armstrong v. Harris*, 773 So. 2d 7, 17 (Fla. 2000), indicated that the difference demonstrated "that both alternatives (*i.e.*, 'cruel' and 'unusual') were to be embraced individually and disjunctively within the Clause's proscription." Lastly, the Minnesota Supreme Court, in *State v. Mitchell*, 577 N.W.2d 481, 488-89 (Minn. 1998), referred to this variation as "not trivial."

Finally, certain states whose constitutions have identical language to the Eighth Amendment have nevertheless interpreted their constitutions to be distinct from their federal counterpart. *See State v. Marshall*, 613 A.2d 1059, 1108 (N.J. 1992) (noting that, while its state guarantee against "cruel and unusual punishments" bears the same text as the Eighth Amendment, "New Jersey's history and traditions" give the clause its own meaning); *State v. Santiago*, 122 A.3d 1, 26-27 (Conn. 2015) (in abolishing the death penalty, the court relied upon the state's "particular sensitivity" to cruel and unusual punishments, stemming "from the earliest days of the colonies, and extending until the adoption of the state Constitution in 1818").

Thus, our sister states have come to differing conclusions regarding the meaning of the textual difference between "cruel punishments," "cruel or unusual punishments," and "cruel and unusual punishments." However, those states which have engaged in a robust analysis of the differences between their state constitution and the federal charter, have largely found greater protections for their citizens under their state charters. This lends support for interpreting Article I, Section 13 to provide greater protections than the Eighth Amendment.

### 5. Policy Considerations

The final factor of the *Edmunds* four-prong analysis considers policy matters, "including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 895. This factor is somewhat unique, and as Chief Justice Thomas Saylor offered, "[i]mplementation of a state constitutional value . . . necessarily entails a searching, evaluative inquiry" into genuinely "unique state sources, content, and context as bases for independent interpretation." Thomas G. Saylor, *Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged Prophylactic Rule,* 59 N.Y.U. Ann. Surv. Am. L. 283,

309-13 (2003). However, we have warned that the "policy" factor could "metamorphose into cover for a transient majority's implementation of its own personal value system as if it were an organic command." *Commonwealth v. Russo*, 934 A.2d 1199, 1212 (Pa. 2007). Thus, in an *Edmunds* analysis, we must take care not to place significant weight on policy matters, writ large, which are more appropriate considerations for the legislature.

In this regard, Appellant offers that Pennsylvania stands as a "national and international outlier" due to its extraordinary number of individuals serving life without parole sentences, which, in turn, is due in large part to being part of a minority of states that mandate life without parole sentences for felony murder. *Id.* at 32. Related thereto, Appellant asserts that the recent trend in state sentencing regimes is away from life without parole for felony murder convictions.[16] Appellant also points to racial bias as a policy reason to find a mandatory life without parole sentence for a felony murder conviction to be unconstitutional, proffering that, although black individuals constitute 12.2% of Pennsylvania's population, they constitute 70% of the more than 5,000 individuals serving a sentence of life without parole in the Commonwealth. Appellant's Brief at 37. Finally, he emphasizes the high cost of incarcerating elderly persons, including increasingly expensive medical care, and the low recidivism rate of these aging prisoners.

Matters such as Pennsylvania's minority status regarding its high number of individuals serving life without parole sentences for felony murder, racial disparities, and the practical ramifications of incarcerating these individuals, are significant, but are general public policy concerns; thus, we must use caution in considering them so as to

---

[16] *See*, *e.g.*, California, Cal. S.B. 1437 (2018); Colorado, Colo. Rev. State. § 18-3-102; Minnesota, MN SF2909.

not encroach upon our sister branch's domain. Ultimately, we find that the proffered policy considerations do not weigh heavily in favor of giving Section 13 independent meaning.

\*　　\*　　\*　　\*　　\*

In conclusion, we believe that the *Edmunds* factors, as analyzed above, provide compelling reasons to interpret Article I, Section 13 broadly, and to provide greater protections to our citizens than those recognized under the Eighth Amendment to the United States Constitution. Our determination is based upon the textual differences between the two constitutions; the historic differences in penological justifications for punishment; and states with similar constitutions to ours which have found independent meaning in their organic charters.

## C. Application

Finding that Section 13 provides greater protections than its federal counterpart, we address whether mandatory life imprisonment without parole for a conviction of second degree murder violates Section 13's safeguards against cruel punishment.

Generally speaking, we find that Section 13 embodies the principle that our citizens are protected from sanctions that are disproportionate to the circumstances of the offense for which they were convicted. This concept is firmly rooted in the Enlightenment philosophy which served as one of the driving forces behind Section 13, and, specifically, the notion of some framers that a sanction beyond that which was necessary for achieving the limited purposes of punishment was considered to be cruel. This right not to be subjected to disproportionate sanctions arises from the longstanding notion of justice that "punishment for [a] crime should be graduated and proportioned to both the offender and the offense" and prohibits punishments that are excessive in relation to the crime committed. *See Baker*, 78 A.3d at 1047; *Miller*, 567 U.S. at 469. Indeed, this principle

has for decades undergirded Eighth Amendment and other states' jurisprudence. *See Kennedy*, 554 U.S. at 419; *Roper*, 543 U.S. at 560; *see also*, *Taylor*, 2025 WL 1085247, at *3 (interpreting the Michigan Constitution's "cruel *or* unusual" language to require that "criminal sentences be proportional to the circumstances of the offense and of the offender such that excessive imprisonment is prohibited") (emphasis original).

Defining with exactness Section 13's notion of cruelty would be a difficult endeavor; however, this appeal does not call for an exhaustive delineation and we need not decide for all contexts the meaning of the constitutional language "cruel punishment." Rather, with respect to the unique constitutional challenge before us, we believe it sufficient to consider notions of culpability, severity, and penological justifications — akin to the factors identified by the United States Supreme Court in creating its framework in *Miller* and *Graham* to resolve its Eighth Amendment jurisprudence regarding juveniles — to assess whether the mandatory imposition of a sentence of life without parole for all offenders convicted of second degree murder is consistent with the protections found in Section 13.

Culpability is central to our analysis of whether punishment is proportional within a category of individuals, here, individuals convicted of second degree murder who are all subject to the same mandatory sentence of life without the possibility of parole. Indeed, at the core of the federal cases considering the constitutionality of the punishment of juveniles is the tenet that certain offenders are categorically less culpable than others. In those decisions, the ban on sentencing was based on "mismatches between the culpability of a class of offenders and the severity of a penalty." *See Miller*, 567 U.S. at 470.

Culpability has long been a cornerstone assessment in classifying crimes in this country. The United States Supreme Court has remarked that "[d]eeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more

serious is the offense, and, therefore, the more severely it ought to be punished." Prabhu, at 457-59 (footnote omitted). Generally, criminal offenses contain at least two mandatory elements: an *actus reus* and a *mens rea*. The former refers to the illegal act itself and the latter to the requisite mental state. For virtually all types of murder and manslaughter, the *mens rea* of the offender in relation to a killing is a determinative factor in homicide grading. *See id*. at 456.

With respect to sentencing, the United States Supreme Court has reasoned that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Graham*, 560 U.S. at 69. As the high Court stated in *Enmund*, "American criminal law has long considered a defendant's intention — and therefore his moral guilt — to be critical to 'the degree of [his] criminal culpability.'" 458 U.S. at 800 (citing *Mullaney v. Wilbur*, 421 U.S. 684, 698 (1975)). Therefore, it follows that one who did not kill another or intend to kill another during the commission of a felony is less morally responsible and less deserving of one of the most severe punishments — mandatory life imprisonment without the possibility of parole — than the actual murderer. *See Graham*, 560 U.S. at 69; *Enmund*, 458 U.S. at 797-801.

As set forth above in greater detail, the United States Supreme Court has issued five decisions that imposed substantive constraints on the imposition of the sentences of death and life without parole. In each, the sentences were disproportionately severe because the offenders, as a category, by virtue of their status or offenses, were insufficiently culpable. *See Atkins* (forbidding the execution of those with "mental retardation"); *Roper* (forbidding the execution of juveniles); *Graham* (given their reduced culpability, barring life without parole for juveniles); *Miller* (banning mandatory sentence of life without parole for juveniles). While these federal decisions were limited to

intellectually disabled individuals or juveniles deemed categorically less culpable than adults, and, thus, less deserving of the sentence of death or life without parole, the principles announced therein are equally applicable to an analysis under Section 13.

Second degree murder covers a wide variety of criminal conduct and varying culpability for a killing. This degree of murder is somewhat of an anomaly, as the malice necessary to support deeming the act to be murder is inferred from the commission of the underlying felony. *Tarver*, *supra*. That is, it requires only an intent to commit the underlying felony, not the killing. Thus, unlike first degree murder, one may be convicted of second degree murder without malice (regarding the killing of the victim), without attempting to kill the victim, or without having any intent to kill the victim. Stated in more colloquial terms, second degree murder does not distinguish between the lookout, and the killer who pulls the trigger. Despite this wide-ranging conduct and differing degrees of culpability, both the killer and the lookout will be subjected to mandatory life imprisonment without the possibility of parole.

Additionally, second degree murder is an outlier, as it is one of the few crimes in Pennsylvania that has only one possible sentence: mandatory life without parole. Most other crimes allow the judge or jury some discretion in imposing a sentence, at least within a certain range. Such discretion allows for consideration of the offender's characteristics and culpability in fashioning an appropriate punishment.

Thus, by its terms, the mandatory penalty scheme of life without parole for all offenders convicted of second degree murder fails to assess individual culpability regarding the intent to kill, and mandates the same punishment regardless of that culpability.

Severity of punishment is an additional factor in determining whether a sanction is disproportionate to an offense. Initially, we note that, in Pennsylvania, first degree murder

constitutes the "most severe breach of the law of this Commonwealth and is therefore subject to our most severe penalty." *Commonwealth v. Fowler*, 304 A.2d 124, 129 (Pa. 1973). To convict an individual of first degree murder requires the Commonwealth to demonstrate that "a human being was unlawfully killed, the defendant was the killer, and the defendant acted with malice and a specific intent to kill." *Commonwealth v. Laird*, 988 A.2d 618, 624-25 (Pa. 2010). The sentence for first degree murder is death or life imprisonment. 18 Pa.C.S. § 1102(a)(1).

Felony murder, which is codified in Pennsylvania as second degree murder, is a criminal homicide that takes place while a defendant is "engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S. § 2502(b). Pennsylvania limits those triggering felonies to "robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S. § 2502(d). As noted, the malice necessary to find the act to be murder is inferred from the commission of the underlying felony, resulting in an offender who did not kill, attempt to kill, or intend to kill subject to conviction of second degree murder. Yet, despite these substantial differences between first degree murder and second degree murder, a conviction for second degree murder results in the same mandatory sentence as noncapital defendants convicted of first degree murder: life imprisonment without the possibility of parole. 18 Pa.C.S. § 1102(b); 61 Pa.C.S. § 6137(a)(1).

The gravity of a sentence of life without parole cannot be overstated. As the United States Supreme Court stressed in *Graham*, while a sentence of death is unique in its severity and irrevocability, life without parole is "the second most severe penalty permitted by law" and imprisoning an offender until he dies shares certain attributes with capital punishment that are dissimilar to any other sentence:

> The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a

> forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence. As one court observed in overturning a life without parole sentence for a juvenile defendant, this sentence "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days."

*Graham*, 560 U.S. at 69-70 (citations omitted).

While it may be entirely appropriate to mandate a sentence of life imprisonment without parole for individuals convicted of first degree murder, the question before us is whether the same mandate for *all* individuals convicted of second degree murder constitutes cruel punishment. Life without parole imposes the harshest imprisonment sanction permitted under the law ─ imprisonment until death without the opportunity for consideration of release ─ regardless of culpability. Due to this scheme's mandatory nature and its unique severity, it poses a great risk of disproportionate punishment. *See Miller*, 567 U.S. at 479 (requiring individualized sentencing when imposing the harshest of prison sentences).

Finally, the reasons supporting a punishment ─ that is, the penological justifications for a sentencing practice ─ are relevant to our cruelty analysis. As noted above, the penological justifications for punishment played an important, albeit not exclusive, role in the adoption of Section 13. Punishment may have multiple and differing goals which lie within the discretion of the legislature. While an examination of penal philosophy can be an academic exercise, we conclude that, consideration of the purposes and effects of a penal sanction aids our Section 13 cruelty analysis. Indeed, as offered by the high Court as part of its Eighth Amendment jurisprudence, "[a] sentence lacking any legitimate penological justification is by its nature disproportionate to the offense."

*Graham*, 560 U.S. at 71; *see also Enmund*, 458 U.S. at 798 (explaining that a punishment which fails to serve any penological goal "'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." (quoting *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).

Thus, we turn to consider the traditional penological justifications for criminal punishment: rehabilitation, deterrence, retribution, and incapacitation. *See Commonwealth v. Coleman*, 285 A.3d 599, 613 (Pa. 2022) (offering that "sentencing serves many 'purposes, including "protection of society, general deterrence (example to others), individual deterrence, rehabilitation, and retribution (punishment, vengeance, desserts)'" (citation omitted)); *Graham*, 560 U.S. at 71 ("the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation"); 204 Pa. Code § 303.11(a) (The Pennsylvania's Sentencing Guidelines establish "a sentencing system with a primary focus on retribution, but one in which the recommendations allow for the fulfillment of other sentencing purposes including rehabilitation, deterrence, and incapacitation.").

Rehabilitation justifies punishment when purposed to cause self-reflection and improvement to lead a crime-free life after incarceration. While this purpose of punishment is to rehabilitate offenders so that they are no longer driven to commit crime, a life without parole sentence eschews it. *See Graham*, 560 U.S. at 74 (life without parole "forswears altogether the rehabilitative ideal"). Although some individuals convicted of second degree murder may reasonably be viewed as outside the realm of rehabilitation, such as someone directly responsible for the murder, this is not the case for everyone convicted of second degree murder. Thus, in the absence of an individualized assessment of the circumstances of a second degree murder, the imposition of mandatory life without parole is inconsistent with notions of rehabilitation.

Similarly, deterrence – structuring punishments so as to discourage a would-be offender from reoffending or to intimidate the public at large from engaging in criminal activity, and, thus, improving public safety – is undercut by imposing a mandatory sentence of life imprisonment without parole for second degree murder. First, if one convicted of second degree murder is sentenced to life without parole, there is no opportunity for the defendant to be released and resist reoffending. Furthermore, when a third party, such as a co-defendant, kills a person, the actions of that third party may be outside of the control of the defendant, and, thus, it makes little deterrent sense to punish the defendant for those actions. More significantly, deterrence goals generally require escalating consequences for escalating severity. Yet, second degree murder provides for a mandatory sentence regardless of the intent to kill, treating all such convictions the same, and, thus, there is no added consequence when a killing *is* intentional. That is, by punishing all felony murder convictions the same, regardless of an intent to kill, the sentencing scheme, counterintuitively, provides no added deterrence for such killings. Stated another way, a sentencing court or parole board is prohibited from taking into account the intent and culpability of someone convicted of felony murder. As such, a mandatory life without parole sentence for all felony murder convictions, without an assessment of intent or culpability, is in tension with a deterrent purpose.

Additionally, retribution is a traditional aim of punishment, representing society's condemnation of a crime. *See Commonwealth v. Torsilieri*, 232 A.3d 567, 589 (Pa. 2020). Retribution aims cannot support a life without parole sentence in all cases of second degree murder. While society may impose severe sanctions to express its condemnation of a crime and to seek restoration of a moral balance, even with retribution there is a proportionality principle, as "[t]he heart of the retribution rationale is that a criminal

sentence must be directly related to the personal culpability of the criminal offender." *See Graham*, 560 U.S. at 71 (citation omitted).

As we discussed, there is no assessment of individual culpability when one convicted of second degree murder is sentenced to a mandatory term of life imprisonment without parole. Therefore, a mandatory sentence of life imprisonment without parole is inconsistent with the retributive principle that punishment should be proportionate to culpability. *Id*. Conversely, providing parole eligibility for some second degree murder offenders would allow the severity of the offender's conduct to be taken into account. Viewed either as an expression of the community's moral outrage or as an attempt to vindicate the wrong to the victim, the retribution justification for mandatory life long imprisonment without the possibility of parole fades with respect to an individual who did not intend to commit or did not commit a homicide.

Finally, the incapacitation justification, the idea of decreasing crime through the removal of an individual from society, thereby eliminating the possibility of recidivism, is premised upon public safety benefits. Recidivism is a serious risk to public safety, and, thus, incapacitation is a significant and important policy. However, the permanent incarceration of an individual is premised upon the notion that he cannot be rehabilitated or deterred from committing a future crime — that is, he will forever be a danger to society, he is incorrigible. See *Graham*, 560 U.S. at 72-73. While incapacitation may be a legitimate penological goal sufficient to justify life without parole in other contexts, we find it cannot justify mandatory life imprisonment of all offenders who have been convicted of second degree murder, without an assessment of culpability.

In sum, we find that a mandatory sentence of life without parole for all individuals convicted of second degree murder cannot be reasonably justified by any of the traditional theories for punishment. While the justifications for punishment may support life-long

incarceration for some convicted of this crime, such justification cannot support life without parole for all offenders, as individuals who have lessened culpability are less deserving of the most severe punishments, necessitating individualized assessment of culpability.

Although the judgment of the General Assembly is entitled to a presumption of constitutionality, it is for our Court, ultimately, to determine whether Section 13 permits the mandatory imposition of a life of imprisonment without parole for second degree murder. We find that the sentencing framework imposing a *mandatory* sentence of life without parole for second degree murder convictions in *all* cases, regardless of the culpability and characteristics of the defendant — including such as the extent of an offender's participation in the conduct, and the details of his offense — without individualized assessment either at sentencing or through parole, prevents the sentencer from considering whether this harshest of sentences proportionately punishes the offender. Furthermore, this mandatory sentencing scheme runs afoul of notions of individualized sentencing for defendants facing the second most severe punishment after death, and the harshest type of incarceration. Finally, the mandatory nature of the sentencing scheme without individualized sentencing lacks adequate penological justification. Ultimately, we find that the mandatory sentencing scheme for second degree murder poses too great a risk of disproportionate punishment, and, thus, find it to be cruel.[17]

---

[17] Our conclusion is broadly consistent with Eighth Amendment jurisprudence. Indeed, the United States Supreme Court has rejected a mandatory life with parole sentence for juveniles without individualized consideration of the details of the crime and character of the offender. *Miller*, *supra*. Just as the high Court has found with respect to juveniles, a life sentence of imprisonment without parole for second degree murder may be appropriate in certain circumstances, "but only so long as the sentence is not mandatory." *Jones*, 593 U.S. at 106. Indeed, our approach is also consistent with the individualized assessment of aggravating and mitigating circumstances required before the imposition (continued…)

Accordingly, we conclude Section 13's prohibition on cruel punishments proscribes a sentencing model which mandates the imposition of life imprisonment without parole for felony murder.[18]   Therefore, we reverse the order of the Superior Court, vacate

_____

of the penalty of death. *See Gregg, supra* (upholding capital sentencing scheme that provided for the weighing of aggravating and mitigating circumstances).

[18] We emphasize the limited nature of our decision today, which addresses only the constitutionality of a sentence of mandatory imprisonment without the possibility of parole for all individuals convicted of second degree murder.  We address a specific type of sentence (mandatory life imprisonment without the possibility of parole), for specific offenders (those convicted of second degree murder without an assessment of individual culpability).  To be clear, under our decision today, the Commonwealth is not required to ensure parole or eventual release to someone convicted of second degree murder.  Such a convict may remain incarcerated for the duration of his natural life.  Rather, we hold that offenders convicted of second degree murder must receive a meaningful consideration of release, based upon their individual culpability and the circumstances surrounding their crime.

Furthermore, we do not pass judgment on the legality or wisdom of the felony murder doctrine itself.  A challenge to the severity of a sentencing scheme is qualitatively different than a challenge to the validity of a substantive crime.  Defining what acts constitute an offense is an authority vested in the legislature, subject to constitutional limitations.  *See Commonwealth v. Church*, 522 A.2d 30, 35 (1987) ("It is recognized that the legislature has the exclusive power to pronounce which acts are crimes, to define crimes, and to fix the punishment for all crimes.  The legislature also has the sole power to classify crimes and designate the procedure applicable at trial and after sentence."); *see also Johnson*, *supra*.

Similarly, our decision should not be read as casting doubt upon the constitutionality of existing sentences for first degree murder, whether punished by life imprisonment or death, which involves a complex legal scheme that takes full account of a defendant's individual culpability and circumstances.  *See* 18 Pa.C.S. § 2502(a) ("A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."); *Commonwealth v. Simpson*, 754 A.2d 1264, 1269 (Pa. 2000) ("To sustain a conviction for first-degree murder, the Commonwealth must prove that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the accused did the killing and that the killing was done with deliberation."); 18 Pa.C.S. § 306(d) ("When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.").

Appellant's judgment of sentence, and remand the matter to the trial court for resentencing not inconsistent with our decision today.

On remand, the sentencing court must, after consideration of Appellant's individual culpability, determine whether he should be resentenced to life imprisonment without the possibility of parole; or to a maximum sentence of life imprisonment, as required by 18 Pa.C.S. § 1102(b), accompanied by a minimum sentence determined by the court. Our allowance for such a minimum and maximum sentence – despite the requirement in 42 Pa.C.S. § 9756(b)(1) that a minimum sentence may not exceed one half of a maximum sentence, and the prohibition in 61 Pa.C.S. § 6137(a) that the parole board has the power to parole all offenders except those serving life imprisonment – flows from our constitutional ruling. We came to the same conclusion in analogous circumstances in our post-*Miller* rulings addressing the resentencing of juveniles convicted of first degree murder who had been sentenced to life imprisonment without the possibility of parole. *See Batts I*, 66 A.3d at 297 (remanding for resentencing for possible maximum sentence of life imprisonment and minimum sentence to be set by sentencing court), and *Commonwealth v. Batts*, 163 A.3d 410, 442-44 (Pa. 2017) ("*Batts II*") (in appeal following *Batts I*, determining severance of 42 Pa.C.S. § 9756(b)(1) and 61 Pa.C.S. § 6137(a) necessary for constitutionally-mandated resentencing of juveniles).

Finally, as we have observed in prior cases where we deemed legislation to violate our Constitution, nothing in our decision today prevents the General Assembly from amending 18 Pa.C.S. § 1102(b) or 61 Pa.C.S. § 6137(a)(1) in a fashion in accord with Section 13's constitutional protections. *See*, *e.g.*, *Commonwealth v. Neiman*, 84 A.3d 603, 615-16 (Pa. 2013)*; City of Philadelphia v. Commonwealth*, 838 A.2d 566, 593-94 (Pa. 2003). Indeed, while we have a clear obligation to ensure that constitutional bounds are not crossed, we may not act as legislators, who are best positioned to effectuate penal

reform.[19]  However, cognizant of the impact our decision today will have, we will stay our mandate for 120 days in order to provide a reasonable amount of time for the General Assembly to consider appropriate remedial measures.  *See Neiman*, 84 A.3d at 616 (staying order to provide General Assembly time to consider appropriate remedial measures); *City of Philadelphia,* 838 A.2d at 594 (staying mandate to allow legislature time to act).[20]

Order reversed, judgment of sentence vacated, and case remanded.  This mandate is stayed for 120 days.

Justices Donohue, Dougherty, Wecht and McCaffery join the opinion.

Justice Dougherty files a concurring opinion in which Justice McCaffery joins.

Justice Wecht files a concurring opinion.

Justice Mundy files a concurring opinion.

Justice Brobson files a concurring and dissenting opinion.

---

[19] Notably, in the wake of *Miller*, the Pennsylvania General Assembly established a new sentencing scheme for juveniles convicted of murder which included individual assessments and mandatory minimum sentences based upon the age of the offender. *See* 18 Pa.C.S. § 1102.1.

[20] As this matter comes to us on direct appeal, and the only question before us is the constitutionality of Appellant's sentence, we decline to address questions of retroactivity.